THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* REGINALD YOUNG, Defendant-Appellant.

First District (4th Division)   No. 78-1373

Opinion filed June 18, 1981.

320

Ralph Ruebner and Michael J. Pelletier, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Barry S. Pechter, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial the defendant, Reginald Young, was found guilty of armed robbery and was sentenced to a six-year term of imprisonment. On appeal he contends: (1) his guilt was not established beyond a reasonable doubt; (2) the trial court erred in permitting the prosecutor to ask defendant a hypothetical question designed to place him in a bad light; (3) improper final argument by the prosecutor deprived defendant of a fair trial.

We affirm.

At trial the following pertinent testimony was adduced. Frankie McGee testified that at about 8:30 p.m. on November 2, 1976, she, her son, Wilton, and her daughter, Alvita, drove to Pepe's Taco Place, located at 87th and Morgan in Chicago. After obtaining their food they walked to their car, parked in the lot east of Pepe's. As Frankie prepared to enter the car a man whom she identified in court as the defendant came up to her, grabbed her purse and at gunpoint threatened to kill her if she did not relinquish it. Wilton also grabbed the purse and the three began struggling. Defendant hit Frankie in the eye with the gun and she and Wilton fell back. The defendant ran toward Morgan through the parking lot, carrying the purse. Frankie testified that the struggle had lasted two to

three minutes, although at the preliminary hearing she had testified that defendant was in her presence for "a matter of seconds." She also testified at trial that there were three street lights near the lot, the closest being 15 feet away. In addition there was a bright light shining in the back of the lot and lights around Pepe's itself shining onto the lot. Defendant was wearing a "midi-like" beige coat, dark pants, and had straight, slick, "superfly" hair. She could not recall specific facial characteristics of the defendant but did remember his face "very well."

Frankie was transported to the hospital where she remained for three or four hours. She then went to the police station, where she was told that a man had been caught and was asked to identify him in a lineup. She viewed a lineup consisting of four men and identified the defendant.

Wilton McGee, who was 10 years old at the time of the incident, also identified the defendant in court as the robber. He testified that the lighting conditions at the car were good. He also described them as "all right because we were right by the corner where the street light was." While the defendant was grabbing for his mother's purse Wilton was less than a foot away. Defendant and Wilton were facing each other for a minute and a half. His description of the defendant corresponded to the one to which his mother testified. Wilton was taken to the hospital where his mother was being treated. There the police asked him to describe the robber and then took him outside to a parking lot where he observed the defendant standing about 15 feet away from him. He told the police that was the man.

Immediately before the incident Officer Daniel Allen, in plain clothes, was on duty inside Pepe's. He first saw the defendant inside the restaurant. About a minute after Frankie left, Allen also went outside. From a distance of 20 to 25 feet he saw a man, whom he identified in court as the defendant, a woman, a young lady, and a small boy, all struggling. Allen testified that there were street lights 15 to 20 feet from the group; he described the lighting as "fairly bright." The defendant struck the woman on the head with a gun while tugging on her purse. The woman tugged back, and defendant hit her again with the gun. She fell back and defendant was left with the purse in his hand. Allen yelled, "Halt, police officer." Defendant, with the gun in his hand, turned and faced Allen. Allen fired two shots, defendant began to run, and Allen chased him. Defendant "turned over his shoulder" and fired two shots at Allen from a distance of about 30 feet. Allen found cover and returned the fire as defendant fled in a northwestern direction. At this time Allen saw and flagged down an unmarked police car. The officers in the car put out a "robbery-in-progress" call, issuing a description furnished by Allen of a male Negro, 24 or 25 years old, wearing a tan coat, dark green pants, and with a Super-Fly hairdo. Allen defined the latter as a pressed or processed

look. He recalled that during the struggle he was not face to face with the defendant, but saw his profile. When defendant first turned after Allen told him to halt, Allen saw him directly. Also when the defendant turned and fired at him while running Allen saw his face for a fraction of a second. Thus he had seen the defendant's face for "only a matter of seconds."

About 20 or 25 minutes later Allen observed the defendant sitting in a police car that drove up to a point parallel to a car in which Allen was seated. While seated in the car Allen stated, "That looks like the man." He then walked over to the other car to within a foot of the defendant, and said, "That's the guy." Allen admitted on cross-examination that at an unspecified time he had recalled saying during this identification, "I can't be sure if that's him; but that is what he was wearing."

Officer William Kemmerling testified that at about 9 p.m. that day he arrested the defendant near 83d and Green, which was four to six blocks from Pepe's. Defendant was wearing a long tan coat and dark pants and had processed ("slicked down and long") hair. At the time defendant was standing on the corner with a woman. He did not flee when approached. None of the robbery proceeds were found on him. Defendant was transported in Kemmerling's marked squad car to Pepe's, where Officer Allen identified him. Kemmerling described the lighting conditions in the parking lot as very good; a number of flood lights were shining on it.

Defendant presented an alibi defense. He testified that at 8 p.m. that day he was watching television at the home of Larry Robinson, at 8419 South Green in Chicago, along with Robinson and Michael Whiteside. Also present in the home was Robinson's mother. The three men watched a program for 15 to 20 minutes and then walked to a store at 83d and Halsted, a four- to five-minute walk. Whiteside entered the store to buy some potato chips, while defendant and Robinson conversed with several men from the neighborhood for five to eight minutes. The three then walked west back to Green where Whiteside left them for home. Defendant and Robinson returned to Robinson's home where they continued watching the television show, scheduled to end at 9 p.m., until just before it ended. Robinson informed defendant he had borrowed some money from his mother and they walked across the street to defendant's home. There defendant put on a tan coat and they proceeded toward the same store they had visited earlier. Defendant encountered his sister, Josephine Young, on the way; he told her he was going to the store and would be right back. At the corner of 83d and Halsted defendant met Dierdre Reddick and began to talk to her as Robinson continued toward the store. Defendant estimated the time to be about five minutes to nine. An unmarked police car pulled up and two plainclothes police officers got out. They told defendant of a robbery that had occurred on 87th Street and asked him to accompany them there. Defendant agreed to go.

As he was being placed in the car Larry Robinson approached. The car then proceeded to Pepe's. Officer Allen was brought over to the car and defendant was told to get out and stand beside the car. Allen stated, "I can't be sure if that is him, but that's what he was wearing." Defendant was handcuffed and taken to the hospital where, with his hands still handcuffed behind him, he was made to stand beside the car, facing the glass door of the hospital. He was then driven to the police station. Defendant denied any involvement in the robbery or the subsequent shooting.

Larry Robinson, who defendant testified was his best friend, Michael Whiteside, who testified that he "practically grew up" with defendant, Dierdre Reddick, who testified she was at one time defendant's girlfriend, defendant's sister Josephine Young, and Larry Robinson's mother, who testified she had known defendant for 10 years, all testified at trial and substantially corroborated defendant's alibi testimony to the extent of the involvement of each of them as described by defendant.

## I

Defendant challenges the sufficiency of the State's evidence against him. That evidence in substance consisted of the testimony of three eyewitnesses to the crime who identified defendant as the one who had committed it. Defendant contends that unnecessarily suggestive identification procedures employed by the police shortly after the crime rendered this identification testimony insufficient to establish his guilt beyond a reasonable doubt.

■■■ First, we do not find the procedures complained of by defendant to have been *unnecessarily* suggestive. The identification by Officer Allen at the crime scene as well as the identification by Wilton shortly thereafter at the hospital were both justifiable as efforts by the police to promptly learn whether they had the right man in custody and could discontinue their search. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. McMath* (1970), 45 Ill. 2d 33, 256 N.E.2d 835, *cert. denied* (1970), 400 U.S. 846, 27 L. Ed. 2d 83, 91 S. Ct. 92.) And although defendant complains that he was the only person in the lineup viewed by Frankie to be wearing a tan coat and having processed hair, the testimony of Officer Kemmerling, who was present at the lineup and described it at trial, establishes that it was conducted fairly. It consisted of four black males, ranging in age from 17 to about 24 and in height from 5'10" to 6'1". All had on dark pants and all were apparently wearing coats. When questioned at trial about this lineup identification, Frankie specifically noted that she remembered the robber's face. Given these facts, we do not find the lineup to have been unduly suggestive. (*People v. Madden* (1977), 52 Ill. App. 3d 951, 368 N.E.2d 384.) Nor do we find any prejudice arising from

the fact that Frankie was told by the police that a suspect was included in the lineup; this was merely a statement of the obvious. *People v. Madden*; *People v. Martin* (1974), 24 Ill. App. 3d 710, 321 N.E.2d 368.

Although we have found that the show-up identifications by Officer Allen and Frankie were justifiable under the circumstances, it is nonetheless clear that such procedures are suggestive and thus subject to judicial scrutiny. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *People v. McMath* (1970), 45 Ill. 2d 33, 256 N.E.2d 835, *cert. denied* (1970), 400 U.S. 846, 27 L. Ed. 2d 83, 91 S. Ct. 92.) Defendant has not contended that because of the suggestiveness of the pretrial identification procedures all identification testimony should have been suppressed, but the same test applicable to the evaluation of such a claim, as set out in *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, would appear to be applicable. Under that test it must be determined whether despite the suggestive aspects of the identifications they were reliable when the totality of the circumstances is considered. Factors to be used in making that evaluation include: the opportunity the witnesses had to view the criminal at the time of the crime, the degree of attention of those witnesses, the accuracy of their prior descriptions of the criminal, the level of certainty displayed by the witnesses in their identifications, and the amount of time between the crime and the identifications. *Manson v. Brathwaite*; *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.

It is clear that all three witnesses had an adequate opportunity to view the man who robbed Frankie. All testified that the lighting conditions were good. According to Frankie the struggle with her robber lasted two to three minutes and she could remember the man's face well from this confrontation. Her prior preliminary hearing testimony that the struggle was for a matter of seconds was not necessarily contradictory and at most presented an issue of credibility for the jury to determine. Officer Allen first saw the man inside Pepe's and then saw his profile during the struggle. He also saw the man's face in full view for several seconds at two intervals during the chase that ensued. Wilton testified that he was face to face with the man for a minute and a half during the struggle. The attention of all three witnesses was on this man during the incident. All were able to describe the man's clothing and hair style with an accuracy unchallenged by the defendant, although they apparently furnished no facial descriptions. Frankie and Wilton were unequivocal in their identifications. There was some impeachment evidence as to Officer Allen tending to suggest that he had initially relied solely on the similarity of defendant's clothing to that of the robber, but at trial he testified that he had positively identified the defendant when he walked over to observe him. Allen's identification was made less than half an hour after

the robbery took place and Wilton's was made shortly after that. Even Frankie's identification, which we have found not to have been made under suggestive circumstances, took place within four hours of the robbery.

■■ Upon consideration of all these factors we find there to have been no substantial likelihood of misidentification arising from the suggestive aspects of the identification procedures. And, as was stated in *Manson*:

> "Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 53 L. Ed. 2d 140, 155, 97 S. Ct. 2243, 2254.)

The suggestive features of which defendant complains on appeal were presented to the jury and their resolution of these issues was not contrary to the manifest weight of the evidence. They were free to accept the State's identification testimony and reject defendant's alibi defense. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

## II

■■ On cross-examination, defendant denied having fired shots at Officer Allen. He was then asked by the prosecutor, "Would you tell us if you did?" A defense objection was denied, and defendant answered, "I can't really say." Defendant now contends that this was an improper hypothetical question designed to place him in an unfavorable light before the jury. We find the question to have been improper; it was argumentative to the extent it amounted to again asking the defendant if he had fired the shots. It also bore the risk of misleading the jury: an innocent defendant's response that he would not tell the jury if he had committed some act which he had denied committing could merely indicate his awareness of his fifth amendment right not to testify at all under such circumstances. However we find no manifest prejudice to the defendant resulting from this question in this case. Defendant was acquitted of the charge directly relating to this alleged shooting, the attempted murder of Allen. And in the context of the evidence we have summarized, which included defendant's identification by three witnesses to the crime, we find this question to have been harmless beyond a reasonable doubt. See *People v. Hampton* (1977), 46 Ill. App. 3d 455, 360 N.E.2d 1333.

## III

■■ In final argument to the jury the prosecutor characterized defense counsel as having produced a smoke screen defense. He also referred to

the defense case as a one-act play based on a "nicely written script." Although these remarks were improper we do not find them to have created reversible error in the context of this case. (*People v. Palmer* (1970), 47 Ill. 2d 289, 265 N.E.2d 627; *People v. Berry* (1960), 18 Ill. 2d 453, 165 N.E.2d 257, *cert. denied* (1960), 364 U.S. 846, 5 L. Ed. 2d 69, 81 S. Ct. 87.) A third comment by the prosecutor that the alibi witnesses needed cue cards but "the best they could do is have a dress rehearsal in the hallway before each one of them testified" was also improper although it constituted in part comment on the admission by several of the alibi witnesses at trial that they had discussed their testimony with each other. However, any error was cured when defense counsel's objection was sustained, and the jury was instructed to disregard the remark. *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.