THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KENT STARKS, Defendant-Appellant.

First District (2nd Division)   No. 82—0894

Opinion filed June 28, 1983.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Louis F. Stalzer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant Kent Starks was convicted of murder and attempted armed robbery after a jury trial. Sentences of 40 years for murder and 10 years for attempted armed robbery were entered on the verdict. Defendant appeals, contending that he was denied a fair trial by virtue of: (1) the testimony of and prosecutorial comment concerning the deceased's survivors; (2) cross-examination and argument concerning a collateral act of misconduct by defendant; (3) the State's failure to complete an impeachment of defendant; (4) cross-examination on a hypothetical matter implicating defendant's fifth amendment rights; (5)

the prosecutor's comments insinuating that the rules of evidence prevented him from presenting relevant evidence to the jury; (6) the prosecutor's comments that defendant and his witnesses were liars and that defense counsel was engaging in trickery and misrepresentation; (7) the prosecutor's comments which tended to denigrate the standard of proof; (8) the trial court's restriction of the testimony of a reputation witness; (9) ineffective assistance of counsel in that (a) counsel failed to obtain discovery of all witnesses to defendant's custodial statement and paved the way for the admission of the statement by calling defendant as a witness; (b) counsel failed to lay a foundation for impeachment of the State's pivotal witness; (c) counsel failed to list an alibi witness in discovery, and the witness was excluded; (d) counsel elicited testimony which indicated that several persons who did not testify had implicated defendant. Defendant also contends that his sentences were excessive.

At about 10:30 p.m. on July 21, 1980, police officers Janis Lewis and Timothy Collins responded to a radio call concerning a shooting at 1215 North Parkside Avenue in Chicago. When they arrived at the scene, they found the body of John Lipinski lying on his back on the sidewalk. The officers found a gold chain and medallion around his neck, a gold watch around his wrist, and $132 in his pocket. The officers discovered a white towel with green stripes lying 10 to 20 feet south of the body. An autopsy revealed that the deceased was killed by a single bullet which entered at the left buttock, traversed the intestines and diaphragm, and perforated the heart.

Defendant was arrested for the murder of John Lipinski on December 24, 1980. The arresting officer testified that he arrested defendant after interviewing Willie Hicks, Mario Godsey, and Mark Jones. Defendant gave a custodial statement to an assistant State's Attorney the next morning. In that statement, defendant said that he was walking north on Parkside with Mark Jones and Mario Godsey on the night of the shooting, when a Caucasian man passed them going south. Jones showed defendant a gun and stated that he was going to rob someone. Defendant told Jones to forget about robbing anyone and took the gun from him. Defendant then crossed to the side of the street where the Caucasian was walking. When he stepped on the curb, someone shouted from a porch. Defendant turned to see who it was, and the gun went off, shooting the Caucasian in the back. Defendant walked up to him and asked him if he was alright. The man said, "my head, my head." Defendant left the scene, dropping a green and white towel on the other side of the street.

Prior to trial, defense counsel moved to suppress the statement on

the grounds that defendant was intoxicated when he gave the statement, that the statement was not voluntary, and that defendant's hand was guided by an assistant State's Attorney when he printed his name at the bottom of it. The motion was denied, and the statement was published to the jury in the State's rebuttal case.

A summary of the significant testimony elicited at trial follows.

The State's first witness was Ginelly Viteri, John Lipinski's fiancee. She testified that she and the deceased had spent the day before the shooting together at the beach, and that they had spoken on the telephone on the night that he was killed. She also testified that she and the deceased had made plans to pick up their marriage license the next day. When asked if she ever spoke to him again, she said that she had not, and when asked where she had next seen him, she replied "at the funeral parlor."

The next witness was Marie Lipinski, the deceased's mother. She testified that on the night of the shooting, the deceased had told her that he was going out to get some ice. She suggested that he take the car, and he said, "Ma, don't worry about me. I'm a big boy and I can take care of myself." She stated that she learned that her son had been killed from policemen who came to the house early the next morning.

Edward Eckman testified that he lived at 1246 North Parkside. On the night of the shooting the street lights were out due to a power failure. Around 10 or 10:15 p.m. Eckman heard voices, footsteps, and a gunshot outside his house. He looked out and saw one figure wearing something light around his neck running south on Parkside. He saw two other figures running in the same direction. He then went outside and found John Lipinski's body on the sidewalk two doors north.

Mark Jones testified for the State that he and Mario Godsey were at defendant's house at 9:30 p.m. on July 21, 1980. They left to get a drink, walking north on Parkside. They saw a white man walking towards them. They continued walking, and the man returned, walking in the same direction as they were on the other side of the street. Defendant said "there goes the white man again" and that he needed some money. The man started running, and defendant pointed the gun at him and shot him in the back. He began to search the man as Jones and Godsey ran away. Jones also stated that defendant was wearing a cap, short pants, and tennis shoes, and was carrying a green and white striped towel. On cross-examination, Jones stated that he did not tell anyone about the shooting until he was arrested on December 24, 1980. Jones also stated that he had lived with defendant's family at times, but that he was not living with them at the time of the shooting.

Ernestine Ford, defendant's mother, was the first witness for the defense. She testified that she, defendant, his sister, and Hattie English lived at 1009 North Parkside at the time of the shooting, and that Mark Jones stayed with them approximately three times a week during that period. She stated that Jones had spent the night with them on July 20, 1980, and that he left the house on July 21 wearing shorts, a cap, and a light colored towel around his neck. She also testified that defendant was in the house from early evening until 11 p.m. on July 21, and that defendant always wore long pants, never shorts. At 11 p.m. defendant walked Hattie English to the bus stop.

Kenna Ford, defendant's sister, also testified that defendant remained at home from early evening till 11 p.m. Hattie English testified that defendant walked her to the bus stop at 11 p.m. where they waited for a bus for approximately 15 minutes. She also testified that she saw Jones leave defendant's house at about noon that day wearing shorts and a cap and carrying a green towel.

Victor Evans, a neighbor of defendant, testified that he saw Jones on July 21 at about 4 p.m., and that Jones was wearing shorts and a cap and a towel around his neck. He also testified that he saw defendant at about 6:30 p.m. of that day and again at 11 p.m., the latter time with a woman. Evans stated that he had never seen defendant wearing short pants.

Defendant testified that he was at home on the night of July 21, 1980. He had been laid off his job as a streets and sanitation worker but had a part-time job at a variety store and was collecting unemployment. He did not go anywhere with Jones or Godsey that night, but had played basketball with Godsey at 4:30 that afternoon. He did not know that he was charged with the shooting of John Lipinski until December 25, 1980, when he was told of the charges at the police station. He had seen Jones, Hicks, and Godsey at the station after his arrest the previous evening. On cross-examination, defendant denied having told police officers that he was on Parkside with Jones and Godsey on July 21, and stated that he did not recall telling the police any of the details contained in his custodial statement. Other portions of defendant's cross-examination raise significant issues on appeal and will be recounted in detail below.

■ The jury found defendant guilty of murder and attempted armed robbery. Defendant was sentenced to 40 years for murder and 10 years for attempted armed robbery, and this appeal followed.

Approximately 13 distinct issues are raised by defendant on appeal. The issues concerning the State's examination of the survivors of the deceased, the cross-examination of defendant, and the State's clos-

ing argument all have significant merit. No defense objections were made during the pertinent portions of defendant's cross-examination or the State's closing argument, and the only issue noted in defendant's post-trial motion was the contention that defendant was prejudiced by the State's continued disparagement of defense counsel, defense witnesses, and defendant during closing and rebuttal argument. During rebuttal argument, defense objections to remarks concerning the burden of proof and defendant's failure to call a witness were overruled. Some defense objections to the testimony of the survivors of the deceased were sustained, but the bulk of their testimony was received without objection. However, we elect to review all of these assignments of error under the plain error rule (87 Ill. 2d R. 615(a)). That rule may be invoked in situations where the record shows the commission of errors that substantially affect the defendant's rights. (*People v. Baynes* (1981), 88 Ill. 2d 225, 231, 430 N.E.2d 1070.) The evidence in this case is not so overwhelming that we can say that the pervasive pattern of error which is apparent from the record did not operate to deny defendant his right to a fair trial, and thus we shall not treat the issues noted above as waived.

■ The first assignment of error concerns the testimony of the State's first two witnesses, Marie Lipinski and Ginelly Viteri. Both testified to their last contacts with the deceased, Marie Lipinski stating that deceased had told her as he was leaving the house that she was not to worry about him because he was a "big boy" and could "take care of [him]self," and Ginelly Viteri testifying that she and the deceased had planned to go to City Hall to pick up their marriage license the next day, that she spoke with him on the telephone on the night of the shooting, and that she next saw the deceased at the funeral parlor.

It is well settled that it is improper for a prosecutor to refer to the family of a murder victim either by evidence or argument. (*People v. Hyde* (1971), 1 Ill. App. 3d 831, 840, 275 N.E.2d 239.) Where testimony that the deceased has left survivors is not elicited incidentally, but is presented to the jury in such a way as to lead the jury to believe that it is material, its admission constitutes reversible error unless an objection thereto is sustained and a curative instruction given. *People v. Bernette* (1964), 30 Ill. 2d 359, 371, 197 N.E.2d 436.

In the instant case, the testimony elicited from these two witnesses cast no light upon the guilt or innocence of the accused, and could only serve to inflame the passions of the jury. Although objections were made, and some were sustained as to particular portions of the testimony of these witnesses, the testimony summarized above was all received by the jury, some of it over the objection of counsel. The

State contends that these two witnesses were "life and death" witnesses, and that therefore their testimony was properly admitted. It is true that the State may present "life and death" witnesses, even where the defendant stipulates to the identity of the deceased and to his death. (*People v. Speck* (1968), 41 Ill. 2d 177, 201-02, 242 N.E.2d 208, *modified on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279.) Such testimony must be presented, however, without placing undue emphasis on the fact that the deceased has left a family behind. (See *People v. Speck* (1968), 41 Ill. 2d 177, 202; *People v. Mitchell* (1979), 78 Ill. App. 3d 458, 460-61, 397 N.E.2d 156.) That such is not the case here is demonstrated by the emphasis that the prosecutor placed on the deceased's relationship to the witnesses in closing and rebuttal arguments. Those statements were as follows:

"The next day John Lipinski was going to get his marriage license *** [defendant] took away his right to get married, his right to have a happy life, his right to finish school and maybe get a better job, his right to have children if he wanted, his right to buy a house.

\* \* \*

Marie Lipinski will never be able to forget the memory of when her son left her and his last words, 'I'm a big boy, Mom, I can take care of myself.' Or Ginelly Viteri, she'll remember how she was supposed to meet him and get a marriage license the next day *** [defense objection overruled]. But the next meeting was in a funeral home. The Lipinskis will remember."

The tone and content of this argument demonstrates that the purpose for offering the testimony of these two witnesses was to arouse the sympathies and the passions of the jury. We find that actual prejudice accrued to defendant as a result of the receipt of this testimony and the argument based on it.

■ The next assignment of error concerns the State's attempt to impeach the testimony of defendant by questioning him concerning a collateral act of misconduct. On direct examination defendant testified that he had been laid off from his job at the department of streets and sanitation at the time of the shooting and was collecting unemployment as well as working part time in a variety store. On cross-examination, the prosecutor asked defendant if he had reported his earnings from the variety store to the unemployment bureau, and defendant said that he had not. In closing argument, the prosecutor referred to this dialogue as establishing that defendant was a "cheat," as well as a "liar" and a "robber."

The State may not bring forth evidence having no tendency to

prove the issue being tried and which only serves to cause the jury to believe that the defendant is a bad person, and hence likely to be guilty of the crime charged. Use of such evidence has been consistently condemned. *People v. Liapis* (1972), 3 Ill. App. 3d 864, 868, 279 N.E.2d 368; see *People v. Scaggs* (1982), 111 Ill. App. 3d 633, 636, 444 N.E.2d 674.

In the instant case, the questions relating to defendant's failure to report income received while he was collecting unemployment and the argument based thereon clearly had no probative value as to defendant's guilt or innocence, and we find them improper.

■ The next assignment of error concerns the prosecutor's attempt to impeach defendant with a prior inconsistent statement. The relevant colloquy is as follows:

"Q. *** You say that the police talked to you and you can remember that they told you what Willie Hicks was saying, isn't that correct?

A. Correct.

Q. And isn't it true that they told you that Willie Hicks said you told him all about the murder? Didn't they say that Willie Hicks said that you told him about the murder?

A. That's what they said.

Q. And isn't it a fact you did tell Willie Hicks about the murder?

A. No.

Q. Isn't it a fact that you couldn't keep your mouth shut about it?

A. No."

The State offered no testimony in their rebuttal case concerning defendant's alleged statements to Willie Hicks. Such a line of questioning assumes that rebuttal testimony will be offered to complete the impeachment. (See *People v. Nuccio* (1969), 43 Ill. 2d 375, 393-94, 253 N.E.2d 353.) If the State were not required to complete the impeachment,

"a defendant would be subject to trial by insinuation and innuendo. In this case, the alleged prior inconsistent statement was the confession of [the defendant]. We can think of no evidence more damaging than the defendant's own words of guilt. Consequently, to falsely state the existence of such a statement is to deny the defendant a fair trial and thus, plain error." *People v. Morris* (1979), 79 Ill. App. 3d 318, 330, 398 N.E.2d 38.

In the instant case, as in *Morris,* the attempted impeachment of defendant had the effect of putting a confession on defendant's lips.

The question itself contained three levels of hearsay, and the State made no attempt to prove the existence of the statement in the face of defendant's denial. We hold that the State's failure to complete this impeachment by calling a witness who heard the statement made was egregiously improper and highly prejudicial.

■■ The next assignment of error also concerns the cross-examination of defendant. The relevant dialogue was as follows:

"Q. You say you didn't kill John Lipinski?

A. That's right.

Q. And, of course, if you did shoot him in cold blood, if you weren't trying to kill him, you would come right in here and tell us all about it, wouldn't you?

A. No."

On closing argument, the prosecutor referred to this portion of the cross-examination as "the only true words out of [defendant's] mouth yesterday."

An essentially identical line of questioning was condemned by the court in *People v. Young* (1981), 97 Ill. App. 3d 319, 422 N.E.2d 1158. In that case, the court stated that such questions bore the risk of misleading the jury because a negative answer to the hypothetical question might demonstrate nothing more than the defendant's awareness of his fifth amendment right not to make any statement at all under such circumstances. (97 Ill. App. 3d 319, 325.) In *Young,* the resulting error was deemed harmless because the defendant was acquitted of the charge to which the question referred. In the instant case, defendant was convicted of the murder of John Lipinski. The question was also reemphasized on closing argument, and any confusion created by the question and answer was thus firmly fixed in the minds of the jury. We hold that the use of this hypothetical question was improper and resulted in prejudice to defendant.

■■ The remaining assignments of error concern the State's closing and rebuttal arguments, which were presented by different prosecutors. The following segment of the rebuttal argument is perhaps the most clearly improper of the objectionable portions of both arguments.

"Mr. Dorfman: *** We did not call Mario Godsey. One thing you should use in this case is your common sense. Jury duty is a common sense task. Mario Godsey, you will remember from the evidence, is Kenna Ford's, the defendant's sister, he's Kenna Ford's boyfriend. Yes, the sister's boyfriend. Think why we might not have called Mario Godsey. But there is another thing. An attorney has a right to interview all witnesses to determine what their testimony is. Mr. Smith has that right. He can talk to

Mario Godsey, and you can bet your life if there was one thing that Mario Godsey would say to exonerate this defendant, Mr. Smith would have given him a subpoena and he would be right here. So it's not ridiculous—

Mr. Smith: Objection to this, your Honor, the man was subpoenaed.

The Court: Overruled.

Mr. Dorfman: He asks where is Mario Godsey. He knows where Mario Godsey is. He can tell you all about Mario Godsey, but the rules of evidence prevent me from doing that at this time.

I would gladly discuss Mario Godsey with you at length, but I can't now and I could only discuss it with you after the trial. So again, who is fooling who? Let's not be ridiculous."

Despite its brevity, this segment of argument contains three distinct improper comments. The first is the prosecutor's comment on the defendant's failure to call Mario Godsey as a witness. Godsey was interviewed by the police prior to defendant's arrest, and, according to the testimony of the State's pivotal witness, was present when defendant shot the deceased. Such a comment is improper where the witness alluded to is equally accessible to the State as to the defense. (*People v. Puente* (1981), 98 Ill. App. 3d 936, 948, 424 N.E.2d 775.) Here, the defense had little reason to call Godsey as a witness, because the defense theory of the case was that Jones, Godsey, and Hicks had conspired to attribute the shooting to defendant. However, the comment was arguably invited by defense counsel's remark in closing argument that Godsey did not testify because he, unlike Jones, could not sit in the witness chair, face defendant, and lie. The other two comments complained of cannot be so justified.

The prosecutor next stated that the rules of evidence prevented him from telling the jury about Godsey. Such a remark, standing alone, was held to constitute reversible error in *People v. Lopez* (1980), 89 Ill. App. 3d 456, 457, 411 N.E.2d 1071.

To complete this triad, the prosecutor essentially made an offer to the jury to discuss Godsey with them after the trial. A statement that prosecutors and defense counsel would be available to answer jurors' questions after the trial was held to be error in *People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86. The court stated that the comment encouraged jurors to reserve their doubts until after the verdict. (76 Ill. App. 3d 280, 285.) In contrast to the relatively innocuous comment in *Martinez*, the prosecutor here offered to give the jury information after the trial that they were currently being deprived of

because of the operation of the rules of evidence. We find that defendant was severely prejudiced by these comments.

■ The next assignment of error concerns the prosecution's continuing disparagement of defendant, the defense witnesses, and defense counsel during closing and rebuttal argument. In particular, the prosecutor emphasized how easy it would be for a "murderer" such as defendant to lie on the witness stand, stated that defendant was engaged in "ridiculous fabrication," and, in response to defense counsel's characterization of lying as the only crime more heinous than murder, stated that the jury need not compare the two crimes, because defendant had committed them both. The defense was characterized as a "pack of lies" and "layer upon layer of lies." The prosecutor also expressed chagrin at the fact that he and the jury were required to "sit in this courtroom and listen to the lies of a cold-blooded murderer *** and [referring to the defense closing argument] listen to forty-five minutes *** of the most ridiculous double talk that I have ever heard in my life."

The prosecutor also stated that he was certain that the jury would not be "hoodwinked" and "fooled" by "that defense, that pack of lies you heard."

It is not improper comment to call the defendant or a witness a "liar" if conflicts in evidence make such an assertion a fair inference. (See, *e.g., People v. Tiller* (1982), 94 Ill. 2d 303, 319, 447 N.E.2d 174; *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 721, 431 N.E.2d 1154.) The same, however, cannot be said for assertions that defense counsel is engaging in trickery or misrepresentation in order to win an acquittal for his client. Comments disparaging the integrity of defense counsel and implying that the defense presented was fabricated at the direction of counsel have consistently been condemned. (See *People v. Clark* (1983), 114 Ill. App. 3d 252, 256; *People v. Brown* (1983), 113 Ill. App. 3d 625, 630; *People v. Witted* (1979), 79 Ill. App. 3d 156, 167-68, 398 N.E.2d 68; see also *People v. Weathers* (1975), 62 Ill. 2d 114, 119-21, 338 N.E.2d 880.) While it is true that the remarks which were made in the above cited cases were more pointed and caustic than the remarks complained of in the instant case, the remarks here, taken with the general tone of the State's final arguments, show a pattern of conduct designed to inflame and arouse the jury. We find that these remarks resulted in prejudice to defendant.

■ Finally, on rebuttal argument, the prosecutor referred to the State's burden of proof in the following manner:

> "The burden of proof in this case, you should know, is no different than in the hundreds of thousands of cases that have

been tried in courtrooms all over this country.

Mr. Smith: Objection, that is not the law.

The Court: Overruled.

Mr. Dorman: The defendant does not stand on a pedestal in this case in this courtroom.

In this case, in terms of what the State must prove, it is no different than in any other case. A theft case, a rape case, a murder case, any type of case. So there's nothing special going on here and we don't have a burden, no matter what Mr. Smith would like you to think and we don't have to produce a weapon *** ."

This argument reduces the State's burden of proof to a *pro forma* or minor detail. (*People v. Martinez* (1979), 76 Ill. App. 3d 280, 285, 395 N.E.2d 86.) Although the argument is fast becoming ubiquitous in the criminal trial courts, it has been universally condemned. (See *People v. Malone* (1983), 114 Ill. App. 3d 55, 64-65; *People v. Bell* (1983), 113 Ill. App. 3d 588, 601; *People v. Scaggs* (1982), 111 Ill. App. 3d 633, 636, 444 N.E.2d 674; *People v. Johnson* (1981), 102 Ill. App. 3d 122, 128, 429 N.E.2d 905; *People v. Ayala* (1981), 96 Ill. App. 3d 880, 883-84, 422 N.E.2d 127; *People v. Hamilton* (1980), 80 Ill. App. 3d 794, 805, 400 N.E.2d 599; *People v. Martinez* (1979), 76 Ill. App. 3d 280, 285, 395 N.E.2d 86.) The fact that the cases dealing with the argument have held that the use of the argument, standing alone, is not reversible error, should not be taken to intimate that the argument is proper, or to encourage its proliferation. Nevertheless, the volume of cases in which the use of this erroneous argument is raised as an issue indicates that it has become a standard arrow in the prosecutorial quiver. In *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301, our supreme court held that the prosecutor's statement that the State's burden of proof was "not unreasonable" and "met each and every day in courts" did not reduce the burden of proof. (94 Ill. 2d 514, 523.) The remarks in the instant case go beyond the bland characterization of the burden of proof in *Bryant.* Here, the prosecutor asserted that the burden was the same in "any type of case" and stated that "we don't have a burden." We believe that there is a boundary of propriety which is so easily crossed by the use of this argument that it would be far better if the argument was no longer made.

We need not determine whether each of the instances of prosecutorial misconduct detailed above would constitute reversible error standing alone. In a case such as this one, where any improper argument that was not made and any improper tactic that was not used would seem to have been omitted by inadvertence rather than by de-

sign, a finding that the cumulative impact of these instances of prosecutorial misconduct requires reversal for a new trial is particularly appropriate. (See *People v. Weinger* (1981), 101 Ill. App. 3d 857, 866, 428 N.E.2d 924.) We stress that, although reversal for a new trial is the appropriate disposition of the instant case, our holding here should in no way be taken to apply only to cases in which the evidence of the defendant's guilt is not overwhelming so as to authorize this type of prosecutorial brinkmanship in cases where the evidence is stronger. As our supreme court has noted, the overwhelming nature of the evidence against a particular defendant serves only to raise the question of whether the defendant has received a fair trial. (See *People v. Weathers* (1975), 62 Ill. 2d 114, 120, 338 N.E.2d 880.) A consistent and intentional course of prosecutorial misconduct is not condoned simply because a reviewing court concludes that that misconduct has failed to achieve its obvious purpose of denying the defendant a fair trial. Perhaps, as another division of our court has recently stated, some reports to the Attorney Registration and Disciplinary Commission are the only antidote to the virulent condition created by the continued use of the type of tactics that were employed in this case. (*People v. Shepard* (1983), 114 Ill. App. 3d 598, 602.) We note that in *United States v. Hasting* (U.S. May 23, 1983), 51 U.S.L.W. 4572, the Supreme Court sanctioned the use of attorney discipline procedures as an appropriate means of deterring objectionable prosecutorial conduct. In response to the offending arguments presented in that case, the Supreme Court suggested that the District Court could have either ordered the prosecutor to show cause why he should not be disciplined or asked the Department of Justice to initiate disciplinary proceedings against him. (51 U.S.L.W. 4572, 4574 n.5.) The court also suggested chastising the prosecutor by identifying him in the District Court's opinion.

Our finding makes it unnecessary for us to consider the additional issues raised by defendant.

The judgment of the circuit court is reversed and the cause remanded for a new trial.

Reversed and remanded.

HARTMAN and PERLIN, JJ., concur.