THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ROBERT EARL WILSON, Defendant-Appellant.

First District (4th Division)   No. 81—172

Opinion filed December 29, 1983.

Steven Clark and Bradley S. Bridge, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Stoioff, and Lawrence R. Stasica, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial defendant Robert Earl Wilson was convicted of rape and deviate sexual assault and was sentenced to concurrent extended-term sentences of 45 years. On appeal defendant contends: (1) the trial court denied him his right to present a defense by denying his attorney continuances necessary for trial preparation and by improperly quashing subpoenas for critical defense witnesses; (2) improper argument by the prosecutor and certain rulings by the trial court during final argument deprived defendant of a fair trial; (3) the trial court erred by improperly instructing the jury on the presumption of innocence in its initial comments to them, by repeatedly telling the jury it wanted a verdict by the court's vacation day, and by making comments tending to favor the prosecution; (4) defendant was improperly found fit for trial based on stipulated testimony; (5) the prosecutor improperly utilized the fact that defendant initially remained silent after his arrest; (6) the trial court erred in refusing to accept defendant's guilty plea because defendant said he was not guilty; (7) defendant's extended-term sentences were imposed for improper reasons.

We reverse and remand for a new trial.

At trial Kay A. testified that at about 1 a.m. on March 23, 1979, she was walking home from work when the defendant approached and

grabbed her by the throat. She sprayed him with Mace but he pulled her to the ground and began choking her and poking her in the eyes. She again sprayed him with Mace and was able to flee, screaming, for about 100 yards before he caught her and threw her to the ground. The defendant again choked her and put his finger in her eyes. He told her to shut up and dragged her into an alley and up some stairs to an apartment landing. He repeatedly demanded that she disrobe but she refused. As he began to forcibly disrobe her a car came down the alley so he forced her down to a basement vestibule. There he forced her to disrobe further, subjected her to an act of cunnilingus, told her she was going to perform fellatio on him, and then forced her to have sexual intercourse with him. While this latter act was taking place a policeman arrived and ordered defendant to "freeze." Defendant was arrested at gunpoint and Kay was taken first to the police station and then to the hospital.

Officer Ronald Keith testified that he arrested defendant at the scene. When Keith arrived defendant was on top of a woman and their clothes were in disarray. When the officer announced his office and told the defendant to stop the defendant got up and put his hands in the air. Keith observed scratches on the woman's neck and saw that one eye was bruised. Her blouse had been ripped open and she was nude from the waist down. The nurse who examined Kay at the hospital emergency room testified that Kay had bruises on her face and back.

The defendant presented the testimony of Dr. Basil Sklan, a psychiatrist at the Chester Mental Health Center's Maximum Security Hospital. As we will set out in detail later in this opinion the defense was precluded by the court from presenting the testimony of other psychiatrists and a psychologist who had examined the defendant, although the written report of the psychologist was introduced into evidence by stipulation.

Dr. Sklan first interviewed the defendant on June 1, 1979. The defendant described hallucinations he had experienced a week before. He told Sklan that his sister, who had died in infancy years earlier, often spoke to him and told him to do things. He also said that he could not control some of the things he did. During the interview defendant exhibited a bland affect, appearing to express no feelings. At that time it was Sklan's opinion that defendant suffered from paranoic psychosis. According to Sklan the defendant was at the Chester facility from May 31, 1979, to July 1980. During that period he was given Haldol, a drug used to suppress psychosis, three times a day. Sklan also testified that the defendant had told him he was cur-

rently still receiving that medication twice a day at the time of trial.

Sklan was aware that Dr. Jewett Goldsmith, a psychiatrist at the Illinois State Psychiatric Institute, had also examined the defendant and had concluded that defendant was a chronic paranoid schizophrenic. Sklan also was aware that defendant had previously been at Chester in 1976 and at that time had been diagnosed as schizophrenic. According to Sklan it was a reasonable conclusion that defendant had been schizophrenic and a paranoid psychotic since at least 1976 and remained so at the time of trial. It was also his opinion, based on a reasonable degree of medical certainty, that defendant was insane on the day of the occurrence and was at that time unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

On cross-examination Sklan admitted that he did not know any of the details of the occurrence. He based his opinion on his interview with the defendant and on the reports of the other specialists who had seen the defendant. Sklan conceded that in none of the other reports he had seen was defendant declared to be legally insane on the date of the occurrence but he also stated that some of the other doctors were not specifically asked to determine sanity as of that time. Sklan testified that a Dr. Vallabhaneni was defendant's primary psychiatrist at Chester. Sklan also testified that one of the reports that he relied on was that of Dr. Janice S. Friedman, a psychologist. In her report of October 27, 1980, she concluded that defendant was schizophrenic. Sklan also relied on the observations of Drs. Reifman, Kaplan, Goldsmith, and Vallabhaneni, who all agreed with his conclusion about defendant's schizophrenic condition. However Sklan conceded that Dr. Bogen and Dr. Reifman had both expressed doubts about defendant's credibility.

Linda Miller, an assistant State's Attorney, testified for the defendant that she spoke to defendant at the police station after his arrest. He told her that his younger sister, who had been dead for 10 years, had told him to "take" the victim sexually and because his sister had told him to do this he had complied, even though he knew it was wrong. On cross-examination Miller testified over defense objection that it was her opinion that defendant was not insane because he was able to appreciate the criminality of his conduct. On redirect examination she stated that she did not know whether the defendant could conform his conduct to the law, although she "had no reason to expect otherwise."

Defendant's mother testified that she had experienced problems with the defendant since he was three years old. Defendant would tell

her that his sister, who had died in infancy, would talk to him and tell him to do things. On one occasion he broke all the windows in the house, telling her later that he did not know why he did it. He had many difficulties in school and only attended high school for three days. In her opinion the defendant was at times unable to control himself and unable to distinguish right from wrong.

Defendant's grandmother also testified that he had spoken of hearing his dead sister talking to him. She too believed that he could not always control himself or distinguish right from wrong. At times he would act like his mind had "gone off."

The report of Dr. Janice Friedman was read into the record by stipulation. She examined the defendant October 27, 1980, conducting an interview and giving the the Rorschach test and the thematic appreciation test. It appeared to her that defendant was trying to reveal nothing in the tests she administered. From her interview she concluded that he was at the command of voices, primarily that of his sister. That voice bid him to perform various antisocial acts. She concluded that defendant was schizophrenic and should be hospitalized and medicated.

In rebuttal the State called two psychiatrists. Dr. Robert Reifman, a board-certified psychiatrist and director of the Psychiatric Institute of the circuit court of Cook County, testified that he first examined the defendant June 22, 1976, in order to determine his fitness for an unrelated trial. At that time the defendant told him he was hearing the voice of his dead sister. He also learned that the defendant had threatened to kill himself if he was sent to a mental hospital. Reifman's diagnosis at that time was that defendant was a schizo-affective type. Reifman explained that defendant had the schizophrenic symptoms of hallucinations and the inability to fully appreciate reality and was also very depressed. Reifman determined at that time that as the result of this mental disease the defendant was unable to cooperate with his counsel and therefore was unfit for trial. The prosecution also elicited from Reifman over defense objection the information that defendant had ultimately pled guilty to the then-pending charge of armed robbery.

Reifman again examined the defendant in August of 1980. This time the examination was to determine defendant's fitness for trial in this cause and to determine the defendant's sanity at the time of the alleged offenses. The defendant was guarded and suspicious. He told Reifman that his dead sister's voice told him to "take" the victim and that he raped her in response to that voice. He claimed not to remember the facts of the rape and his arrest. However according to Reif-

man this claim was contradicted by the fact that the defendant had told another doctor at the Psychiatric Institute about the occurrence, depicting the intercourse as voluntary. Reifman stated that he had some doubts as to defendant's credibility in claiming to hear voices. At the time of the examination he was unable to come to a conclusion as to the defendant's sanity at the time of the occurrence. He did find that defendant still suffered from a schizophrenic reaction, schizo-affective type. However the defendant was being treated with thorazine and Reifman found at that time that his condition was sufficiently in remission as to permit him to go to trial. Reifman found that the defendant was not psychotic at the time of the interview; he did still have a mental disease but was in a lucid interval.

The prosecutor asked Reifman a hypothetical question about the sanity of an individual who had committed the acts ascribed to the defendant. This hypothetical question included the fact that the individual cooperated with the police, giving them basic booking information, but then refused to make any statement after being told his rights. The individual subsequently told an assistant State's Attorney that he attacked the victim on his dead sister's instructions, even though he knew it was wrong. Reifman's opinion was that this hypothetical individual was able to appreciate the criminality of his actions and was able to conform his conduct to the requirements of the law.

The prosecution's hypothetical question had not included any information about the hypothetical man's past mental history. In cross-examination the defense elicited from Reifman the fact that in examining the defendant he was aware of previous diagnoses of defendant's schizophrenia by Drs. Kaplan, Bogen, Sklan, and Vallabhaneni. Reifman was then asked whether the additional fact that the hypothetical man in the prosecution's question had in the past suffered from schizophrenia would make a difference in his opinion. Reifman responded that though he would still be inclined to find the person sane this information would weaken his conclusion and he would be more hesitant in saying the person was sane.

Also testifying for the prosecution was Dr. Gilbert Bogen, a board-certified psychiatrist with the Psychiatric Institute. Bogen first examined the defendant on April 26, 1979. At that time the defendant was hesitant, expressed fear and agitation, and talked of suicide, saying he heard a voice telling him to kill himself. Bogen diagnosed defendant than as acutely psychotic, suffering from a schizophrenic disorder, paranoid type, and in need of mental treatment.

On August 7, 1979, Bogen examined the defendant again. Defendant told him he had been arrested while having consensual sexual in-

tercourse with a woman who accused him of rape when the police arrived. Defendant still talked of suicide and stated that he heard his sister's voice. He thought the staff at Chester was lying to him. Bogen believed that defendant was still psychotic and unfit for trial. He also believed that defendant should be placed on antipsychotic medication.

On March 20, 1980, Bogen examined the defendant and found him fit for trial. He still believed the defendant was suffering from schizophrenia but stated that the disease was in remission with medication.

On July 14, 1980, Bogen again examined the defendant. He continued to diagnose the defendant as having a schizophrenic disorder, paranoid type, in remission. Defendant claimed to have no recollection of the offense but Bogen questioned his credibility. He again found the defendant fit for trial but could reach no conclusion as to the defendant's sanity at the time of the alleged offense.

When given a hypothetical question which included what Bogen knew of defendant's background and the facts of the occurrence and defendant's arrest, Bogen concluded that the person in the hypothetical question was sane. He conceded that he was aware of most of this information on July 14, 1980, when he had been unable to determine whether defendant was sane at the time of the occurrence. However he cited two facts in the hypothetical question, previously unknown to him, which he said enabled him to render an opinion: the fact that the man moved to a more secluded area when car lights appeared, and the fact that the man told the victim to shut up when she screamed.

I

We first consider defendant's contention that the trial court denied him his right to present a defense by denying his attorney's request for continuances and by quashing subpoenas for critical defense witnesses.

The defendant was found to be unfit to stand trial on May 29, 1979. He was not adjudicated as fit for trial until a hearing before the trial judge on October 2, 1980. Defendant's trial counsel first represented defendant in this cause on July 18, 1980, before Judge Harry Schreier, when she informed the court that defendant would not cooperate with her and she did not consider him yet fit for trial. Following the October restoration hearing defense counsel obtained several continuances until November 13, 1980, a Thursday. On that date she informed the court that she was not ready for trial, that the doctors who were to testify for the defendant on the issue of sanity were not in Chicago and still had to be subpoenaed. She told the court that the

names of these witnesses were Dr. Vallabhaneni, Dr. Sklan, Dr. Tabilon, and Dr. Janice Friedman. Counsel also informed the court that she had not yet discussed with defendant whether he would request a jury, she had not yet interviewed the complaining witness, and had not seen any of the State's physical evidence. The court noted that the case was one of the oldest on its call and it had been set for trial the last time it was continued. On those grounds the court denied the motion for a continuance. After counsel had conferred with defendant she announced that he would be requesting a jury trial. *Voir dire* of the venire commenced that afternoon.

The next day, Friday, defense counsel informed the court that she had learned the Department of Mental Health intended to contest on Monday her subpoenas of their doctors. She requested that the court issue a writ of *habeas corpus ad testificandum* requiring the Department to produce the doctors as material and necessary witnesses. The court held that due diligence was not exercised in preparing the case, noted that it would take eight hours for the doctors to arrive from Chester in southern Illinois, and denied the petition. Defense counsel indicated that the doctors could testify Monday, Wednesday or Thursday of the next week, but the court stated: "I am going to proceed. I am going on vacation Thursday. I intend to have this case disposed of prior to the time I leave on my vacation." The trial then commenced.

The following Monday, November 17, prior to the testimony of the State's last witness, an attorney from the Department of Mental Health appeared and moved to quash the subpoenas of Dr. Vallabhaneni and Dr. Tabilon. Both he and defense counsel informed the court that the doctors had been personally served. The court granted the motion, again referring to the eight-hour travel time, and stating that the request for the witnesses was unreasonable and untimely. Because Dr. Sklan, another Department doctor, had voluntarily appeared the motion to quash was not directed toward his subpoena.

After Dr. Sklan testified that afternoon the trial judge informed the jury that no testimony would be heard on Wednesday because of a funeral the judge had to attend. In response to a juror's question about the chance that the trial would continue until Friday the court responded:

"None at all, none at all. It will be completed by Thursday. If I have to work these people here to midnight on Thursday, I am going to do it because I don't feel I want to spend that much time of my vacation over here because it's something that could be adjusted but I don't think it's necessary. I want to give them enough time and sufficient time so they are not pressured into

anything and give you folks enough time to make any deliberations on how much time you want to resolve the issue without too much difficulty. So, as I indicated, I am going to adjourn until tomorrow *** ."

After the jury was dismissed for the day defense counsel asked that the subpoena of Dr. Vallabhaneni be reinstated, stating her belief that he could be in court by Thursday if not Tuesday. The court denied the request and stated that if another subpoena were presented it would also deny that as not timely.

The next day, Tuesday, November 18, defense counsel again requested reinstatement of the subpoena of Dr. Vallabhaneni. She informed the court that he was the doctor who had spent the most time with the defendant at Chester and that he had diagnosed the defendant as schizophrenic. The court again denied the request.

Later during the proceedings on Tuesday defense counsel informed the court that Dr. Friedman, who had accepted a subpoena for that day, would be unable to come because of an attempted suicide, apparently by one of her patients. Counsel told the court that Dr. Friedman would be able to appear at 1 p.m. Thursday, the next scheduled trial day. The court responded:

"No. Absolutely, Nine o'clock Thursday morning. Let the record show Thursday morning is my vacation date, a date I had planned to go on my vacation. I agreed to come back here only because of the fact something arose of an emergency nature in my family. I indicated I would continue this matter to give you people time to present your case yesterday, and I further indicated to the jury what the tentative programs and plans of operation were with reference to this court. *** I will begin the trial promptly on Thursday morning at nine o'clock. I will not consider any continuances or any delay in the postponement."

As we have noted, Dr. Friedman did not testify but on Thursday morning her report was submitted by way of stipulation.

Also on Thursday morning defense counsel told the court that the Department of Mental Health was prepared to allow Dr. Vallabhaneni to testify and that he would be available "next week." The court denied counsel's request for a continuance on that ground. Defense counsel also told the court that another defense witness, Dr. Jewett Goldsmith, was on vacation and would not be available to testify until December 5. Counsel stated that she had attempted to contact Goldsmith the previous Friday and again on Monday, November 17. According to counsel Dr. Goldsmith had diagnosed the defendant as a person with chronic paranoid schizophrenia. The court denied a con-

tinuance to that date, and the prosecution refused to stipulate that Dr. Goldsmith would have testified as to that condition.

In essence defendant contends that as the result of these actions by the trial court defendant's right to present a defense was so impaired as to prejudice his right to a fair trial. The State contends that the court properly exercised its discretion and that defendant was not prejudiced. In reviewing the court's exercise of discretion in such matters the courts will examine the diligence of the defendant's attempts to obtain the witnesses, whether their testimony would be material to the case and might have affected the outcome, and whether defendant's right to a fair trial has been prejudiced. *People v. Robinson* (1973), 13 Ill. App. 3d 506, 301 N.E.2d 55; *People v. Timms* (1978), 59 Ill. App. 3d 129, 375 N.E.2d 1321.

On the question of materiality and possible prejudice, it is clear that the issue of defendant's sanity at the time of the occurrence was closely contested at trial. All three psychiatrists who testified agreed that defendant suffered from schizophrenia. Dr. Sklan's opinion was that defendant was legally insane at the time of the occurrence. Dr. Reifman reached the opposite conclusion on the basis of a hypothetical question which omitted the fact of defendant's mental illness. When asked to include this fact in his evaluation he expressed some hesitancy in adhering to his opinion of sanity, although he was still inclined to find the person sane. Dr. Bogen, on the basis of a hypothetical question which included the facts of the occurrence and the defendant's mental illness, was more definitive in his determination that the person was sane, but he conceded that when he had previously evaluated the defendant and was aware of virtually all the same facts he had been unable to reach a conclusion as to defendant's sanity at the time of the occurrence. Given this record it is clear that defendant was prejudiced in not being able to present to the jury the material testimony of Dr. Vallabhaneni, Dr. Tabilon, and Dr. Friedman, who all had agreed that defendant suffered from schizophrenia. The jury was informed of the bare fact of those conclusions by means of stipulation and references by witnesses. But defendant was denied the considerable impact of their live testimony, especially in the case of Dr. Vallabhaneni, who had been defendant's main psychiatrist at Chester. Defendant was also deprived of the opportunity to ask them the same hypothetical question which had enabled the State to elicit from its psychiatrists an opinion on sanity which those witnesses had previously been unable to reach despite having evaluated the defendant in person.

Against these considerations we must weigh the trial court's

stated reasons for denying defendant's requests for continuances and for quashing defendant's subpoenas. The court asserted that the cause was one of the oldest on its call, and that counsel had not been diligent in her efforts to obtain the presence of desired witnesses. But in fact defendant had been judicially determined to be unfit for trial only two months after the occurrence and was presumed to remain unfit until his restoration hearing almost 16 months later on October 2, 1980. As late as July 18, 1980, defense counsel informed the court that defendant was not cooperating with her. Thus when the trial court denied defendant a continuance on November 13, 1980, counsel had had little more than five weeks to prepare for trial since the time defendant was found fit for trial. Furthermore, even assuming that the trial court's denial of a continuance was a proper exercise of discretion, we find no justification for the court's quashing of the subpoenas of Dr. Vallabhaneni and Dr. Tabilon subsequently issued by defense counsel. Contrary to the State's assertion on appeal the record clearly establishes that these subpoenas were properly served on the doctors: the attorney for the Department of Mental Health conceded this fact at the hearing on the motion to quash. Moreover the asserted hardship on the doctors or on Chester was outweighed by defendant's interest in obtaining the testimony of the doctors who had treated him and who had diagnosed his schizophrenia. It is noteworthy that even when the Department indicated that it would permit Dr. Vallabhaneni to testify the court refused to continue the trial for the short period that would have been necessary. It would appear that the trial court's determination of this matter may have been influenced in part by the court's concern with preventing a delay in its planned vacation. For these reasons we agree with the defendant's contention that the trial court abused its discretion in barring defendant from obtaining this testimony. And in this cause, where a close question was presented on the key issue of the defendant's sanity at the time of the occurrence, we cannot say that the exclusion of defendant's expert witnesses might not have affected the determination of his guilt by the jury. For that reason we find that this was reversible error. *People v. Timms* (1978), 59 Ill. App. 3d 129, 375 N.E.2d 1321.

## II

■ Although we would reverse and remand on this ground alone, our decision to do so is also supported by what occurred during final argument to the jury. In closing argument the prosecution repeatedly argued to the jury, over defense objection, that if defendant were

found not guilty by reason of insanity he would automatically be released. When defense counsel objected on the ground that the defendant's release would not be automatic the court overruled this objection but stated that defense counsel would also have an opportunity to comment on what might happen in the event of an acquittal. However when in her final argument defense counsel attempted to inform the jury that the defendant could be found in need of mental treatment upon acquittal, the State's objection was sustained. The court stated that it was proper for the State to comment on the fact the defendant would be released if acquitted but warned of possible sanctions if defense counsel persisted in her argument. The initial comments of the prosecutor were improper. (*People v. Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081; *People v. Etten* (1975), 29 Ill. App. 3d 842, 331 N.E.2d 270, *cert. denied* (1976), 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2207; *People v. Hering* (1975), 27 Ill. App. 3d 936, 327 N.E.2d 583.) In fact, if defendant had been found not guilty by reason of insanity a hearing would have been required to determine if he was in need of mental treatment. (Ill. Rev. Stat. 1979, ch. 38, pars. 115—3(b), 1005—2—4(a).) The trial court's action in initially overruling defense counsel's objection and then preventing her from attempting to correct the false impression created by the prosecutor's argument constituted error.

 The prosecutor also commented to the jury, over defense objection, that Dr. Sklan was the only psychiatrist they heard testify who concluded defendant was insane at the time of the occurrence. He then noted that Sklan was not defendant's primary psychiatrist and that the jury did not hear from defendant's primary psychiatrist. Of course what was not revealed to the jury was that defense counsel had been prevented by court rulings from presenting the testimony of other expert witnesses. In particular her subpoena of Dr. Vallabhaneni, defendant's primary psychiatrist, had been quashed at the urging of the prosecution. Under these circumstances the argument of the prosecution was improper and unprofessional. *People v. Ellison* (1980), 89 Ill. App. 3d 1, 411 N.E.2d 350.

 The prosecution repeatedly referred to the defense case as being a smoke screen, an argument that has been held by the court to be improper. (*People v. Young* (1981), 97 Ill. App. 3d 319, 422 N.E.2d 1158.) Moreover the prosecution suggested to the jury that an insanity defense was not proper in a rape case, specifically stating that such a defense had never before been presented in a rape case. Defense counsel's objection to this argument was overruled by the court. This comment was clearly an incorrect statement of the law and it

was grossly improper. *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 41, 99 S. Ct. 848.

In attacking the defendant's claim of insanity the prosecution directed the jury's attention to the defendant's apparently normal behavior during the trial. But when defense counsel attempted to rebut this inference by suggesting that defendant had been under medication during trial the trial court sustained the prosecution's objection and instructed the jury at length that nothing in the record supported this argument and thus it should be disregarded. In fact Dr. Sklan had testified that an antipsychotic drug had previously been given to the defendant three times a day and that defendant had told him he was still taking this medication at the time of trial.

All of these errors during final argument tended to improperly cast doubt on defendant's insanity defense. Thus they added to the prejudicial impact of the trial court's rulings with respect to the defendant's expert witnesses. Based on all of these errors we find that defendant was denied a fair trial and thus his convictions must be reversed and the cause remanded for a new trial. Because of our disposition of these issues we need not reach the remainder of defendant's contentions on appeal.

Defendant's convictions are reversed and the cause is remanded for a new trial.

Reversed and remanded.

LINN and JOHNSON, JJ., concur.