| NOTICE |
| --- |
| This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1). |

2026 IL App (4th) 250383-U

NO. 4-25-0383

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 21, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
| --- | --- | --- |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| ROLAND BREAULT, | ) | No. 16CF1399 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John T. Gibbons, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, finding (1) the State proved beyond a reasonable doubt that defendant did not act in self-defense, (2) the trial court did not abuse its discretion in excluding hearsay evidence, (3) defendant did not establish plain error regarding the State's comments in closing argument, and (4) the trial court did not err in giving an initial-aggressor jury instruction.

¶ 2     Defendant, Roland Breault, was convicted by a jury of involuntary manslaughter (720 ILCS 5/9-3 (West 2016)) for the stabbing death of Joseph Pendergrass. He appeals, arguing (1) the State failed to prove beyond a reasonable doubt that he did not act in self-defense; (2) the 911 call he made on the day of the incident should have been admitted at trial under the excited utterance exception to hearsay; (3) he was denied his right to a fair trial where the State referenced excluded evidence, misstated the law, and shifted the burden of proof in its closing argument; and (4) the trial court erred in giving a jury instruction pertaining to an initial aggressor's use of force where there was no evidence that defendant was the initial aggressor.

¶ 3     We affirm.

¶ 4                        I. BACKGROUND

¶ 5     On June 29, 2016, defendant was indicted on four counts of first degree murder, a Class M felony (*id.* § 9-1(a)(1)). All four counts charged that, on May 31, 2016, defendant stabbed Pendergrass with a knife, causing his death.

¶ 6     Prior to trial, defendant filed a motion to permit the use of certain audio and visual recordings that were made on the day of the incident. Specifically, he sought the use of an approximately 27-minute-long video compilation made up of surveillance camera video, audio and visual recordings from his personal cell phone, and recordings from his personal body-worn audio recorder. This compilation included an audio recording of defendant making a 911 call shortly after the incident.

¶ 7     The State stipulated to the admission of portions of the compilation that showed defendant arriving at the location of the incident and the events of the incident itself. However, it filed a motion opposing the admission of the 911 call audio, arguing that it was inadmissible hearsay and did not qualify for the excited utterance exception.

¶ 8     At a May 7, 2024, hearing, the trial court heard evidence on the issue. Nicole Nowling testified that on May 31, 2016, she was working as a 911 operator for the City of Rockford. That evening, she received a call from defendant, whom she described as difficult to understand due to his emotional state and the fact that he was "giving [her] so much information at once." The 20-minute-long audio recording from defendant's body-worn recorder was played in court. Approximately seven minutes into the recording, defendant can be heard speaking to Pendergrass, followed by sounds of a scuffle and grunting. Approximately 30 seconds later, sounds of the scuffle stop and defendant states, "Get out of here. Get out of here." For the next

approximately five minutes, defendant is heard breathing heavily while a car accelerates in the background. At the 14-minute mark, defendant is heard stating, "Mary, Mary. Joe just—Joe just attacked me," followed by a dial tone and the sound of a call being placed. Defendant again speaks to the person in the background—later identified as his wife, Mary Ann Breault—stating, "Joe Pendergrass just attacked me. Yeah, yeah he came in the clinic, and he came right at me. I ended up stabbing him."

¶ 9 When defendant reaches the 911 operator, he asks her to send police to his home and informs her that a stabbing just occurred at a separate location. He states again that he was attacked by Pendergrass and adds, "[Pendergrass] is stabbed. I did protect myself." Defendant gives Nowling background information on the incident, stating, "It was an alarm scenario—two business owners splitting," and that the two people involved in the altercation with him were Pendergrass and Pendergrass's wife, Cathy Dzik. He informs Nowling that he dropped the knife he used to stab Pendergrass at the other location. When asked where Pendergrass is at that moment, defendant replies that he does not know, but Pendergrass would likely be going to the hospital because he was bleeding. Immediately after stating this, defendant again addresses Mary Ann in the background, stating:

> "Honey, can you get my chips out of this phone? 'Cause I was filming *** him when he attacked me. But *** Cathy smashed my phone***and Joe knocked it out of my hand before he started punching me. Cathy went over there and started smashing it. And uh, Joe was ready—he was gonna kill me. He was going after me to kill me. He never said a word hardly, he just came straight at me and started punching and kicking, smashed my phone out of my hand, started punching and kicking. And I saw Cathy over there stomping on my phone to get rid of evidence!

- 3 -

It was unbelievable."

The 911 call ends shortly after.

¶ 10 Mary Ann testified that on May 31, 2016, defendant entered into their home in a "heightened excitable state," stating that he needed a phone. She observed that his speech was fast and excited, his eyes were wide, and his face was flushed. She stated that she had never before seen defendant act that way during their marriage.

¶ 11 After considering the totality of the evidence surrounding the call, the trial court found that it was a hearsay statement that did not qualify for the excited utterance exception. The court noted that, although only six minutes had elapsed between the time of the stabbing and the time of the call, this was enough time for defendant to reflect on the situation and "guide the narrative of the call to his advantage or in a way that benefited his interest in asserting self-defense." It found that defendant was "direct, coherent, and organized" during the call, which provided insight into his mental condition and suggested he was not in an excitable state. It also found that the call was motivated by self-interest, noting defendant's concern with preserving evidence on his cell phone rather than seeking police assistance and that defendant sounded noticeably less stressed when speaking to his wife in the background, as opposed to the 911 dispatcher. The court explained, "[W]hile there was a stressful incident and [defendant] certainly had stress, the call was more akin to the defendant ensuring that his viewpoint of the facts and necessity of actions was quickly recorded." It concluded that the spontaneity of defendant's statement was undermined to the extent that the 911 call could not be considered an excited utterance for purposes of a hearsay exception. It therefore ruled the call was inadmissible.

¶ 12 Defendant's trial began on May 13, 2024. The State elected to proceed only on count IV of the indictment, which alleged that on or about May 31, 2016, defendant committed

the offense of first degree murder by stabbing Pendergrass with a knife, knowing the act would create a strong probability of death or great bodily harm to Pendergrass, thereby causing the death of Pendergrass. See 720 ILCS 5/9-1(a)(2) (West 2016).

¶ 13        Curt Wilson testified that on May 31, 2016, he was employed as a patrol commander with the Loves Park Police Department. On that day, he was dispatched in response to an alarm at Advance Medical Rehabilitation Center (AMR), a medical rehabilitation facility. While en route to AMR, he received another report that a woman had called 911 stating that her husband had been stabbed. The woman and her husband had pulled over into the parking lot of a local school approximately one mile from AMR. Wilson decided to respond to this call. He stated that when he arrived at the school, he observed a midsize SUV in the parking lot with a woman standing outside of the vehicle on the passenger side. He identified the woman as Dzik. As he approached the vehicle, Dzik pleaded with him to save her husband's life, telling him that he had just been stabbed. Wilson observed an unresponsive White male in the SUV's passenger seat, whom he identified as Pendergrass. As paramedics treated Pendergrass, Dzik informed Wilson that the stabbing had occurred at AMR, leading Wilson to realize that the two dispatch calls were related. Wilson testified that at the time he was with Dzik and Pendergrass, he was in contact with other officers who had responded to AMR. These officers told him that the doors to the building were locked, but they were able to observe blood inside the building through an entrance door off of the parking lot.

¶ 14        Adam Wolgast testified that, on May 31, 2016, he was employed as a detective with the Loves Park Police Department and responded to the dispatch call at AMR. He stated that the initial call was related to a business alarm and "a disgruntled ex-employee maybe causing an issue there." When he entered AMR, he observed a pocket-sized knife with its blade open on the floor

near a doorway. He also noticed blood spatter on the walls in a hallway in the same area.

¶ 15 Gerard Collins, who was a crime scene investigator at the time, testified that he was originally dispatched to AMR, but, after he received a call that Pendergrass had died, he was redirected to the hospital to obtain Pendergrass's clothing and then to the police station to take photographs of defendant and obtain any evidence. Collins recalled that defendant had an injury on his right forefinger but no other observable injuries. He stated that defendant did not request medical attention while at the police station. Photographs that Collins had taken of defendant were admitted into evidence. The photos showed a cut to defendant's finger, as well as blood on his shirt, his hands, the right side of his forehead, and his cheek. Collins also testified that he took swabs of the blood on defendant's hands for analysis.

¶ 16 Following Collins's testimony, a stipulation between the parties regarding the video compilation was read to the jury. The stipulation provided that on May 31, 2016, defendant had used his cell phone and a personal audio recorder to record his arrival at AMR and some of the events that occurred that day. It also provided that AMR had security cameras installed, which recorded some of the events as they occurred. All of this data was then delivered to Lance Sloves, a forensic expert in the extraction and presentation of digital data, who compiled the various recordings together into a single 27-minute-long video. This video was then played for the jury.

¶ 17 The video begins with defendant recording himself driving into the parking lot of AMR. He states that he intends to go into the building to use the fax machine and that he will keep his video running. Defendant enters the building and greets a few of the employees. A few minutes pass as he sends faxes while employees and some remaining patients can be heard and seen interacting around him. Approximately nine minutes into the video, defendant addresses the camera and states that it appears everyone has left the building. Shortly thereafter, he walks into

an office and remarks to the camera, "So it looks like they've been busy." He shows the camera a piece of paper left on a desk stating that AMR is protected by security and that anyone responsible for tampering with the security system will be prosecuted to the full extent of the law. Defendant then walks into another room and addresses an employee named Lacee Campbell, informing her that he is going to disable the alarm system. He refers to Lacee as the "liaison" for a doctor at the clinic, Clarke Shih, and tells her to tell Shih that he needs to change the codes for the alarm system back. Campbell shakes her head and refuses, to which defendant replies, "Do it," before leaving the room. Defendant then speaks to his camera again, stating that he's going to turn his phone off and will turn it back on "if [he] need[s] to."

¶ 18　　　　　Video from an AMR security camera later shows defendant and Campbell having another interaction for approximately 25 seconds, but there is no sound to the recording. A different security camera then shows Campbell setting the alarm for the building and leaving. Defendant begins filming on his cell phone again as he walks outside to confront Campbell. An alarm can be heard beeping in the background. Defendant states to Campbell, "Let me get this straight, you just set the alarm, right? I'm in here working, you just set the alarm on me again? You wanna shut the alarm off? You have the code." Campbell responds, "Kiss my ass."

¶ 19　　　　　While continuing to film on his cell phone, defendant returns to the building and attempts to unlock a door, behind which is access to the security system. Defendant notes that "they" put a new lock on the door and he cannot gain access. He then attempts to shut off the alarm by disconnecting a power panel on the outside of the clinic. Despite defendant shutting off power to the building, the alarm system continues beeping. Defendant reenables power and states that he will need to get some equipment to open the locked door to the security system. He notes for the camera, "So they're definitely locking us out of the building."

¶ 20        The next shot is security video of defendant back inside the building, continuing to inspect the locked door. He takes his phone out and begins filming. At the same time, an outdoor security camera shows Pendergrass and Dzik entering the building through the door to the parking lot. Pendergrass enters first and begins walking down a long hallway toward defendant. Defendant turns toward Pendergrass and raises his phone, filming him. He asks, "Joe, are you coming here to check on me or something?" When Pendergrass reaches defendant, he slaps the phone out of defendant's hand, and the phone recording goes black. Security video with no audio shows defendant taking a few quick steps back from Pendergrass before reaching into his pocket and pulling out a knife. Pendergrass walks toward defendant, and defendant holds the knife behind him in his right hand and pushes Pendergrass back with his left. Pendergrass steps backward, out of sight of the security camera. Defendant then runs toward him, holding the knife at his side with the blade pointed toward Pendergrass. He takes approximately three or four steps before he, too, moves out of the camera's frame.

¶ 21        Security video then shows defendant running from the building and out into the parking lot, looking behind him multiple times. Pendergrass and Dzik follow shortly after. Dark spots are visible on the front and back of Pendergrass's shirt, and he holds a hand to his chest. When they exit the building, Dzik runs out of sight of the camera, with her hand raised high and back, as though she's throwing something. Pendergrass stumbles in and out of the door to the clinic a few times. The video ends with a later shot of a police officer peering through the door to the clinic that the parties exited out of earlier.

¶ 22        Dzik testified that in 2016, she was married to Pendergrass and working as a chiropractor at AMR. She testified that AMR was owned by Shih and Mary Ann. Prior to the events of May 2016, Shih and Mary Ann's business relationship had deteriorated, and they were

in the process of dissolving their partnership. On cross-examination, Dzik explained that the split between Shih and Mary Ann was related to a money dispute. She acknowledged that she took Shih's side in the split and that she and Shih eventually stopped referring patients to Mary Ann, causing Mary Ann to take a job elsewhere.

¶ 23　　　Dzik testified that defendant was given keys and alarm codes for the building because he would occasionally come in to do repairs or mow the grass. However, after the deterioration of the business relationship, Shih decided to change the alarm codes.

¶ 24　　　Dzik testified that on May 31, 2016, she left work shortly before 6 p.m. Not long after, she received a call from an employee at AMR informing her that defendant was at the clinic. She told the employee to set the alarm for the building and leave.

¶ 25　　　Dzik returned to AMR, and Pendergrass accompanied her because he did not want her to go alone. When they arrived, Dzik noticed defendant's vehicle parked at the back entrance to the building. She and Pendergrass entered the building and observed defendant standing at the end of a hallway. She stated that after Pendergrass knocked the phone out of defendant's hand, it flew into a nearby exam room, where she retrieved it from behind an X-ray machine with her foot. When asked about the phone, she stated,

> "[Defendant] had been recording myself and all the employees and walking through the building repeatedly since November. And I kept saying to him over the course of those months, 'Quit recording me.' And he constantly stuck a phone in my face, and I had complained of that at home. And so then when he stuck the phone in Joe's face, he was not having it."

¶ 26　　　Dzik testified that she did not see the fight between defendant and Pendergrass because she was in the neighboring room retrieving the phone. By the time she came out of the

room, defendant was running out the back door and Pendergrass was getting off the ground. She thought the two had only wrestled, but she then saw blood on the front of Pendergrass's shirt and a bloody handprint on the glass of the door. She stated that Pendergrass told her he thought he was dying. She and Pendergrass exited the building and saw that defendant was still in the parking lot. She threw defendant's phone at his car and then helped Pendergrass into her own vehicle. She called 911 on the way to the hospital and was instructed to pull over. She stated that Pendergrass lost consciousness in the car and later died.

¶ 27 Campbell testified that on May 31, 2016, she was employed at AMR to perform billing services. Prior to leaving the building on that day, she spoke to defendant and informed him that she was turning on the alarm system. After he yelled at her for doing so, she called Dzik to tell her what had happened. She stated that Shih was her grandfather and that after the dispute between Shih and Mary Ann, Shih told her not to assist Mary Ann in any way.

¶ 28 Blake Aper, a forensic scientist with a specialty in DNA, testified that he collected and tested the blood that was found in various locations in the clinic, the blade and handle of defendant's knife, defendant's hands, defendant's clothing, and the "fingernail scrapings" of Pendergrass. He also created DNA profiles for both defendant and Pendergrass. Aper concluded that for all of the blood samples he collected, Pendergrass either could not be excluded as a contributor or matched the DNA profile. In contrast, the swabs from defendant's hands were the only ones in which Aper found a profile that had any consistencies with defendant.

¶ 29 Dr. Mark Peters, an expert in forensic pathology, testified that he examined Pendergrass's body after his death. He observed four stab wounds on Pendergrass, two on his back and two on his chest. Additionally, Pendergrass had one "incised wound" on his back, which Peters described as a "cut barely to the skin," and multiple abrasions. Peters testified that the stab wounds

to Pendergrass's chest penetrated into his heart and caused internal bleeding, resulting in Pendergrass's death. Peters further testified that he observed no defensive wounds on Pendergrass.

¶ 30　　　　Following Peters's testimony, the State rested. Defendant moved for a directed verdict, arguing there was no evidence that he knowingly acted in a way that created a strong probability of death or great bodily harm to Pendergrass. The State responded that the video compilation showed defendant, armed with a knife, lunging toward Pendergrass and subsequently leaving covered in Pendergrass's blood. The prosecutor acknowledged, "I understand [defense counsel's] opinion of that video is that it shows self defense. The State's position is it does not show self defense." The trial court agreed with the State and denied defendant's motion, finding that the evidence presented could support a finding of guilt beyond a reasonable doubt.

¶ 31　　　　The defense then called its witnesses. Heidi Naser testified that she was an employee at AMR responsible for insurance and billing. Although she originally reported to both Shih and Mary Ann, Shih directed her not to process any of Mary Ann's insurance claims after the business relationship fell apart. Naser testified that there was tension in the office between Shih and Mary Ann, with "both blaming each other for the failure of the business." She testified that Shih changed the alarm codes for the building and told Naser that if Mary Ann or defendant came to the building, she should "follow them around to make sure that they weren't doing anything inappropriate." She stated that on the day of the stabbing, Shih told the employees who were working to leave, set the alarm, and contact Dzik so she could be there when the police arrived.

¶ 32　　　　Mark Rouleau testified that he was an attorney for Mary Ann and had represented her in a few different matters, including her business dispute with Shih. On May 31, 2016, he received a call from Mary Ann and subsequently went to the Loves Park Police Department to speak to defendant. He took pictures of defendant at that time and noticed abrasions on defendant's

forehead and right brow area. He testified that he informed defendant at the jail that Pendergrass had died and observed defendant to be "shocked" by the news.

¶ 33      Larry Blum, a medical doctor and expert in forensic pathology, testified that, based on his review of various materials in the case, Pendergrass's wounds were consistent with having been produced while Pendergrass and defendant were on the floor engaged in an altercation, with defendant below and Pendergrass on top of him. He testified that the wounds on Pendergrass's chest would have taken very little force to inflict. Blum also found that the absence of defensive wounds on Pendergrass's hands was significant and "eliminate[d] [the scenario] where one person [was] attacking another viciously and the other person [was] trying to protect themselves." However, he acknowledged on cross-examination that in certain scenarios, a person who was attacked would not have defensive wounds. He also noted that defendant bore a cut to his index finger, which could have been a defensive wound if Pendergrass was able to gain control of the knife at some point.

¶ 34      Mary Ann testified that she was married to defendant and was a doctor of physical therapy. She and Shih, a chiropractor, each had their own corporations, but they established an additional corporation together as a means of jointly handling the payroll, accounting expenses, and building services for both of their corporations. Defendant was the vice president of this corporation and, because he was a carpenter, helped with renovating AMR's facility in 2006, when they moved in. Additionally, because defendant performed maintenance tasks for the building, he had continuing authorization to enter the office and had the building's alarm code.

¶ 35      Mary Ann testified that in November 2015, she and Shih noticed that their payments were decreasing year by year. She stated that rather than putting any effort into solving the business issues, "[Shih] started to focus effort on cutting [her] out of [her] business

completely." These efforts included refusing to assist Mary Ann in covering the cost of the payrolls when the corporation had insufficient funds, informing the employees that Mary Ann was responsible for the lack of funds, changing the computer codes so Mary Ann did not have access to the databases, "methodically *** put[ting] things in place" to make it difficult to see her clients, sending letters to her patients asking them to endorse their checks to AMR rather than Mary Ann's corporation, and changing the alarm codes to the building. Eventually, Mary Ann filed a complaint against Shih and Dzik. The lawsuit was ongoing at the time of the incident on May 31, 2016.

¶ 36       Mary Ann testified that, a week before the events of May 31, 2016, she and defendant went to AMR and attempted to enter the building using their alarm codes. However, their codes did not work, and the police came to the premises. She stated that the police allowed them to remain at the building and work. Mary Ann contacted Shih to inquire as to why their codes did not work, but she never received an answer.

¶ 37       Mary Ann testified that on May 31, 2016, she was at her home at around 6:40 in the evening when defendant came rushing into the kitchen in a panicky state, trying to get to a phone. She observed his face to be swollen and flushed and stated that he was wide-eyed and moving quickly. He called 911 and had a discussion with the operator, after which police officers arrived and took him away in handcuffs.

¶ 38       Defendant testified that he went to AMR on May 31, 2016, in order to send some faxes for Mary Ann's business. He stated that his purpose in recording his actions on that day was to prove that he and Mary Ann were not causing trouble and that Shih and Dzik were locking them out and making false complaints to the police.

¶ 39       Defendant testified that when Pendergrass and Dzik arrived at the building, Pendergrass made a "beeline" for him. He observed that Pendergrass appeared angry and was

"doubling up his fist" and cocking his arm back. He stated, "It was apparent when [Pendergrass] got that close to me what was looking to happen." He testified that, after knocking the phone out of his hand, Pendergrass kneed him, shoved him, and hit him on the right side of his head. At that point, he stepped back and reached into his pocket for his utility knife. He noted that he put his knife down by his side to keep it out of harm's way, stating, "I didn't want to stab the guy. I wanted to just shove him so I had to run. I had to get out of there." He stated that he attempted to move past Pendergrass down the hallway, but Pendergrass charged him and "jammed" him against the wall, putting his forearm up against defendant's chin. Defendant then stated that he "poked" Pendergrass with the knife at "mid level somewhere." He stated that at no point did he intend to kill Pendergrass.

¶ 40      Defendant testified that Pendergrass reached for his knife while hitting him in the head and "groin[ing]" him. He slipped out of Pendergrass's hold, but Pendergrass grabbed his shirt's collar, continuing to hit him. He stated that Pendergrass threw him backward and charged him. The two men landed on the floor, with defendant flat on his back and Pendergrass on top of him with his arm again across defendant's neck. For the entire interaction, Pendergrass continued to reach for defendant's knife. The two men moved down the hallway, defendant "shimmying backwards" and Pendergrass readjusting to stay on top of him. Defendant testified that he was "in a fight of [his] life," in extreme fear, and unable to breathe. He stated, "I was running out of breath. I was in serious trouble."

¶ 41      Defendant testified that he "went for broke" to escape from Pendergrass's hold and, once he did, he reached over as fast as he could to hit him in the back. Defendant explained, "I stroked my arm three times as hard as I could to stop his violence. I had to stop him." He stated that he lost hold of the knife and it cut his finger, prompting him to drop it. He then got to his feet

and ran from the building. He testified that as he was leaving the clinic, his mental state was "[p]andemonium. Panic," and that Pendergrass was following closely behind him. Referring to a segment in the video compilation that shows him exiting the clinic, defendant stated, "I'm scared as hell. I had to get the hell out of there. This man was going to kill me. *** I was afraid for my life." He stated that at no point did Pendergrass ever cease coming after him.

¶ 42         On cross-examination, the State questioned defendant on the events that happened after he stabbed Pendergrass and was taken to the police station. Defendant confirmed that he was placed into a room and, sometime after midnight, was given an opportunity to call Mary Ann. The State asked,

> "And in that conversation with your wife, did you say, [']I'm trying to play it back in my mind and I can't see. There was such pandemonium. I cannot remember. It was just him attacking. I don't know what happened, and I'm getting punched. I know I was swinging, trying to get out of there. I don't remember. Oh, God, I don't remember. I cannot play it back verbatim.['] "

Defendant confirmed that this sounded accurate. The State then asked defendant to confirm if, when he called Mary Ann six hours after the event, he had no recollection of what had occurred in the hallway, but eight years later, when at trial, he claimed to remember the specific details of what happened. Defendant agreed. On further questioning, he also confirmed that he did not tell police that Pendergrass picked up the knife after he dropped it, that Pendergrass choked him at any time, that he could not breathe, that he was scared, or that he believed Pendergrass was going to kill him. Defendant explained, "I had just been through a traumatic [*sic*]. I was in shock and traumatized. I was given [*sic*] a big picture. I wasn't giving them blow by blow."

¶ 43         The State asked defendant if, rather than running toward Pendergrass to the exit

- 15 -

that Pendergrass and Dzik had entered through moments before, he could have easily gone out a different exit from the building that would not have required him to move toward Pendergrass. Defendant responded, "I didn't have the presence of mind. I was shocked at that moment. I had to get out." He further noted that the door he ran toward opened quickly and was close to where his car was parked, whereas the other door required multiple turns to open and was not near his car.

¶ 44　　　　　Following defendant's testimony, the defense informed the trial court that it intended to rest its case. The parties then proceeded to discuss jury instructions. Defense counsel requested that the jury be instructed on the lesser included offenses of aggravated battery and involuntary manslaughter. After discussion with the parties, the court allowed the jury to be instructed on these offenses in addition to first degree murder. Defense counsel further requested that the court give Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 24-25.09X), which provided that a person who did not initially provoke the use of force against himself had no duty to flee before using force against the aggressor. The State objected, and the court asked the basis for its objection, noting, "The facts that the courts [*sic*] saw showed that the decedent was the initial aggressor in this case." The State agreed, noting, "This defendant was not the initial aggressor, so [IPI Criminal No. 24-25.09X] [is] not relevant here." The court responded that it believed the instruction was relevant. The State apologized and, after taking a moment to read the committee notes for the jury instruction, requested that the court then also give Illinois Pattern Jury Instructions, Criminal, No. 24-25.09 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 24-25.09), which concerned an initial aggressor's use of force. The State argued that this instruction was appropriate in the instant case, where the evidence showed that defendant had "lunge[d]" at Pendergrass after Pendergrass had backed away and withdrawn. The State argued, "In this case, it's the State's position, [Pendergrass]

does withdraw and then the defendant becomes an aggressor by attacking him. The jury can see the evidence and they get to decide. The jury gets to decide who is the aggressor." Over defense counsel's objection, the court decided to give IPI Criminal No. 24-25.09 along with IPI Criminal No. 24-25.09X.

¶ 45        The defense then rested its case and, following the State's rebuttal, moved for a directed verdict. The trial court denied the motion, finding the State had presented sufficient evidence to support a guilty verdict beyond a reasonable doubt. With respect to self-defense, the court noted that Pendergrass could be seen backing away from defendant after defendant produced the knife, supporting the conclusion that defendant was not justified in the force that he used.

¶ 46        The parties proceeded to closing arguments. The State explained its burden of proof, telling the jury that, if any of the necessary elements of the offense were not proven beyond a reasonable doubt, the jury must find defendant not guilty. Later, when discussing self-defense, the State further iterated, "And let me say something right here. Defendant has no burden. In this case they do for self defense, but defense has no burden."

¶ 47        Referencing IPI Criminal No. 24-25.09, the State further argued,

> "A person who initially provokes the use of force against himself is justified in the use of force only if in good faith he withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force.
>
>           ***

> *** Joe backs up. The defendant runs down. Joe's hands are up. ***
> [Defendant] had his knife out. He was on [*sic*] the aggressor. He was chasing Joe
> down the hall."

¶ 48    The State also emphasized that defendant, when speaking both with the police and his wife after the stabbing, "never said in any way that he felt that he was *** likely to die, likely [to] receive great bodily harm. He was just trying to get out of the building he said." It noted that,

> "[W]hen the defendant was testifying on direct, he made a lot of statements. But
> when on cross-examination, *** when the defendant was asked about statements
> he made to the Loves Park Police Department, he admitted he made those
> statements.
>
> So just because it didn't come out in direct, it came out in the cross. Those
> statements that he admitted to are adopted. You can use those substantively as if he
> testified to those on the stand, even though I was the one that read them and asked,
> ['D]id you say this.['] And once he says yes, he adopts that. So that's substantive
> evidence. Okay. Just as if he had testified to it."

It later placed further emphasis on defendant's statements following the stabbing, stating,

> "You're telling your wife, the business partner, your spouse, the mother of your
> children what happened, and you say you can't remember. If this person was trying
> to kill him, would he have said ['H]e was trying to kill me; I had to defend
> myself?['] None of that comes out. Not until he testifies at trial eight years later.
> Wouldn't you, in the heat of the moment, say, ['H]e was trying to kill me?['] That's
> the first thing you say. [']He was trying to kill me.['] Or ['H]e was beating [me] up

so badly, I thought I was going to die[,'] or [']I was being choked.['] Never says anything about that.

Admits he never told the police he was being choked. Admits he never told the police he was scared for his life. Admits he never told the police that he was scared as hell or thought [Pendergrass] was going to kill him. *** Admits he never told the police that he thought he was passing out. So he came up with this, ['O]h, he had this arm on my throat and *** I couldn't, I couldn't talk.['] Ye[t] he never told police that. That's something he invented.

*** When he found out [Pendergrass] died, everything changed. His story had to change."

¶ 49 Following closing arguments, the trial court read the agreed-upon instructions to the jury, including IPI Criminal No. 24-25.09. The court additionally instructed the jury that defendant was presumed innocent of all charges against him, that this presumption remained with him throughout every stage of the trial, that the State had the burden of proving defendant guilty beyond a reasonable doubt, and that defendant was not required to prove his innocence.

¶ 50 While deliberating, the jury sent a note to the trial judge asking for police statements from the night of the stabbing. Below that request, the jury also wrote a statement that a photo exhibit of Pendergrass's hand taken after his death showed a cut to his middle finger. After conferring with defense counsel and the State, the court answered the jury's first question by stating that it had received all of the evidence in the case and asking it to continue deliberating. Because the statement regarding Pendergrass's injuries was not a question, the court did not respond to it.

¶ 51        The jury found defendant guilty of involuntary manslaughter and not guilty of first degree murder and aggravated battery. Because he had already served the maximum time possible for his conviction, the trial court ordered his release. He was sentenced to 4 years and 6 months in the Illinois Department of Corrections (DOC), followed by 6 months of mandatory supervised release (MSR), and given credit for 2,875 days served.

¶ 52        Defendant filed a motion for a new trial, in which he argued, among other assertions, that the trial court erred in barring him from introducing the audio recording of his 911 call and in granting the State's request to read IPI Criminal No. 24-25.09 to the jury. The court denied the motion.

¶ 53        Defendant later filed a motion to reconsider and vacate his sentence. He argued, in part, that the trial court was not authorized to impose a term of MSR where he was not taken into the custody of DOC. The court subsequently amended his sentencing order to waive the six months of MSR.

¶ 54        This appeal followed.

¶ 55                          II. ANALYSIS

¶ 56        On appeal, defendant raises the following four arguments: (1) the State did not prove beyond a reasonable doubt that he did not act in self-defense; (2) the audio recording of his 911 call was admissible under the excited utterance exception to the bar on hearsay, and the trial court abused its discretion in excluding it; (3) he was denied his right to a fair trial where the State argued excluded evidence, misstated the law, and shifted the burden of proof in its closing argument; and (4) the court erred in giving IPI Criminal No. 24-25.09 where there was no evidence that defendant was the initial aggressor. We will address each argument in turn.

¶ 57                          A. Sufficiency of the Evidence

¶ 58          "The due process clause of the fourteenth amendment to the United States Constitution [(U.S. Const., amend. XIV)] requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When assessing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* It is not a reviewing court's role to retry a defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Rather, we give great deference to the factual determinations of the trier of fact. *Id.* at 542. We will reverse a conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.*

¶ 59          "Self-defense is an affirmative defense and, once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004).

> "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Id.* at 225.

If the State negates any of these elements, the defendant's self-defense claim will fail. *Id.*

¶ 60        Although defendant argues that the State failed to negate all six elements of self-defense, the State, in response, focuses on only two: that defendant was the aggressor and that deadly force was necessary. Accordingly, we will limit our analysis to these two elements.

¶ 61                                    1. *Whether Defendant Was the Aggressor*

¶ 62        Defendant argues that Pendergrass was the initial aggressor in the altercation because Pendergrass was the first to make physical contact. Specifically, he notes that Pendergrass approached him, knocked his phone out of his hand, kneed him and punched him, and made a "beckoning motion" with his hands after defendant pulled out his knife. Defendant further notes that "there was no dispute that [defendant] was not the initial aggressor where, at the conclusion of trial, the trial court stated that the evidence presented showed that Pendergrass was the initial aggressor, and the State agreed." He argues that the State's stance on appeal that defendant was the initial aggressor is inconsistent with its concession in the trial court. He therefore urges us to reject the State's argument on this point outright.

¶ 63        The State argues that the evidence was sufficient to show defendant was the initial aggressor based on defendant's actions prior to Pendergrass knocking the phone out of his hand. The State notes that defendant did not have the alarm codes for AMR, that he had been "constantly sticking a phone in [Dzik's] face and recording" for months leading up to the incident with Pendergrass, that he walked toward Dzik and Pendergrass in a narrow hallway, that he " 'aggressively' " asked Pendergrass what he was doing there, and that he stuck his phone in Pendergrass's face. The State concludes that a reasonable jury could have found defendant was the aggressor where he deliberately set off the building's alarm and used aggressive words and conduct with Dzik and Pendergrass.

¶ 64 We agree with the State. Although the State argues that defendant was the aggressor based on his actions prior to Pendergrass slapping the phone from his hand, we find his actions after that event to be more compelling. Specifically, we find that the evidence was sufficient to show that defendant *became* the aggressor at a later point in the interaction between the two men, after Pendergrass had attempted to disengage. In the video compilation, after Pendergrass slaps the phone from defendant's hand, defendant takes a few steps back, brandishes his knife, and pushes Pendergrass back with his free hand. Pendergrass moves back and, critically, continues stepping backward even when defendant is no longer pushing him. (We note that, although defendant characterizes Pendergrass's hand movements at this time as "beckoning" defendant to begin fighting, we find it equally plausible that Pendergrass was simply speaking with his hands and using gestures to emphasize his words. His palm-up gesture could easily have accompanied words such as, "What are you doing," or, "I'm not looking for a fight."). It is at this point, when Pendergrass is off-camera, that defendant quickly moves in the direction in which Pendergrass has just disappeared.

¶ 65 We find this sufficient to allow the jury to conclude that Pendergrass, even if he was the initial aggressor, later withdrew from the fight, and that defendant then became the aggressor by pursuing Pendergrass after his retreat. "The right of self-defense does not justify a person in committing an act of retaliation or revenge [citation], nor does the right permit a person to pursue and inflict injury upon an initial aggressor after the aggressor abandons the altercation." *People v. Dillard*, 319 Ill. App. 3d 102, 106 (2001). The video compilation presented evidence sufficient for a rational jury to conclude that defendant escalated the fight to one with deadly weapons, Pendergrass attempted to disengage, and defendant then pursued him. See *id.* at 107 (finding the State disproved the defendant's self-defense claim where another party instigated a

fight with defendant but then turned and walked away, at which point the defendant struck him again); see also *People v. De Oca*, 238 Ill. App. 3d 362, 367-68 (1992) (finding the trial court did not err in determining the defendant was the initial aggressor where an initial fistfight provoked by the decedent had ended and the defendant then instigated a second fatal confrontation by displaying a gun and shooting the decedent).

¶ 66        Defendant argued at trial that he ran toward Pendergrass only in order to exit out the door that was behind him, not to continue the fight. This may be true, and we do not suggest that defendant's account of events is implausible. Rather, we find only that the evidence was sufficient to allow the jury to conclude otherwise. We also note that the jury might have found defendant's credibility undermined by various factors and may therefore have treated his account with skepticism. For example, although defendant testified that Pendergrass struck him repeatedly off-camera, including kneeing him, shoving him, striking him in the groin, hitting his head, and strangling him, photos of defendant taken after the altercation did not reveal substantial injuries, and the only blood from defendant was found on his own hands, which could have been from the knife slipping from his grip and cutting him. Further, Collins testified that he observed no injuries on defendant and, to his knowledge, defendant did not request medical attention while at the police station. Additionally, a rational jury may have found it unbelievable that defendant would have chosen to run toward Pendergrass—the man whom he claimed was threatening his life—rather than away from Pendergrass and toward another unencumbered door out of the clinic merely because he was not thinking clearly and the other door required more effort to open than the one behind Pendergrass. Further still, although defendant testified that, when Pendergrass approached him, he was cocking his arm back and forming a fist, the cell phone video of the encounter does not show this. It instead shows Pendergrass walking toward defendant with his arms at his sides

and his hands open up until the moment he raises his hand to slap defendant's phone away. The jury, as the trier of fact, was responsible for assessing defendant's credibility as a witness. *See Dillard*, 319 Ill. App. 3d at 106. It would not be unreasonable for the jury to disbelieve certain or all aspects of defendant's account.

¶ 67 Defendant further argues that the State conceded at trial that Pendergrass was the initial aggressor, and we should therefore reject its argument to the contrary on appeal. Relying on *People v. Denson*, 2014 IL 116231, ¶ 17, he argues that the State may not advance a theory or argument on appeal that is inconsistent with the position taken below.

¶ 68 In *Denson*, the State filed a pretrial motion to admit certain hearsay statements from the defendant's coconspirators. *Id.* ¶ 3. The defendant objected, but the trial court ruled in the State's favor. *Id.* At trial, the defendant was found guilty of first degree murder, armed robbery, and home invasion. *Id.* ¶ 1. He appealed, arguing, in part, that the trial court erred in admitting the coconspirators' statements. *Id.* ¶ 4. The appellate court affirmed, finding the defendant had forfeited the issue by failing to object when the statements were read at trial. *Id.* The defendant appealed to the supreme court. *Id.* ¶ 5.

¶ 69 Before the supreme court, the State argued that the appellate court was correct in finding that the defendant had forfeited the issue by failing to object at trial when the coconspirators' statements were read into evidence. *Id.* ¶ 15. The supreme court, however, noted that, in an earlier trial involving one of the defendant's codefendants, the State had not filed a motion *in limine* and had instead addressed the admissibility of the coconspirators' statements during the trial itself. *Id.* ¶ 16. In contrast, in the defendant's case, the State had informed the trial court that it decided to file a motion *in limine* specifically to avoid similarly halting trial for an objection. *Id.* The supreme court observed, "In other words, the State filed its motion *in limine* not

only *expecting* that defendant would not object at trial if that motion were allowed, but *precisely so that* defendant would not object at trial if that motion were allowed." (Emphases in original.) *Id.* The court found it was entitled to reject the State's forfeiture argument outright, noting, "[W]hile a prevailing party may defend its judgment on any basis appearing in the record, it may not advance a theory or argument on appeal that is inconsistent with the position taken below." *Id.* ¶ 17.

¶ 70      In the instant case, while discussing jury instructions, the defense sought to have IPI Criminal No. 24-25.09X read to the jury. The State argued that IPI Criminal No. 24-25.09X was not relevant because it concerned a noninitial aggressor's duty to retreat and "this defendant was not the initial aggressor." The trial court responded that it believed the instruction was relevant for that exact reason and the State apologized, reviewed the committee notes, and then asked the court to also give IPI Criminal No. 24-25.09, which concerned an initial aggressor's use of force.

¶ 71      In contrast to *Denson*, the State here did not induce defendant to take certain actions and then contend on appeal that those actions were in error. Rather, despite its initial comment, it appears that the State always held the position that Pendergrass was not the initial aggressor, or at least that he did not initiate the final fatal encounter between himself and defendant. For example, when discussing whether IPI Criminal No. 24-25.09 should be given, the State argued,

> "In this case, [Pendergrass] physically withdraws. There's distance between them. So the jury gets to decide, did he withdraw? If the defense counsel is going to argue that he's the initial aggressor, they're going to—without the jury being instructed, they can basically argue to the jury that because he was the initial aggressor, at any point, Joe Pendergrass now has no right in any capacity at any time to defend himself.

That is not true. There are circumstances where even an initial aggressor gets to defend themselves. And in this case, it's the State's position, he does withdraw and then the defendant becomes an aggressor by attacking him."

The State continued,

"If defense counsel is going to get up there and say Joe Pendergrass is an aggressor, he is the aggressor. He stays the aggressor. He's always the aggressor. This provides the jury with the legal framework to say, maybe he was the initial aggressor. But we either find or do not find these circumstances; that either he did back away or the defendant does then become the aggressor at that point."

¶ 72        From these statements, it is clear that the State's position at trial was that the determination of who was the aggressor, and at what specific time he became the aggressor, was a question for the jury and not an agreement between the parties. It acknowledged that the defense would argue that Pendergrass was the initial aggressor and thus sought to admit a jury instruction that a noninitial aggressor—in this case, defendant—could later become the aggressor by continuing to engage where the other party has retreated. We do not find that a single comment by the State, possibly said in confusion, during a discussion between the parties on the applicability of a jury instruction, should be construed as a "concession" by the State that defendant was not the initial aggressor where it otherwise made clear its argument that defendant was the aggressor in the final, fatal confrontation.

¶ 73                    2. *Whether Deadly Force Was Necessary*

¶ 74        Defendant argues that Pendergrass was "several inches taller and much bigger" than him, struck him repeatedly, and placed him in extreme fear for his life. He further notes that he was the only one with wounds that could be construed as defensive, that the unrebutted testimony

of Blum suggested that the stabbings occurred while he and Pendergrass were on the ground and Pendergrass was on top of him, and that the video of him fleeing AMR after the altercation showed he was fearful and panicking. Accordingly, he argues that the evidence showed he had reasonable grounds to believe that he was in danger of losing his life, which necessitated the use of deadly force.

¶ 75 We find the evidence was sufficient to allow the jury to conclude that the use of deadly force was not necessary. The only evidence supporting defendant's claim that he was afraid for his life was his own testimony, and the jury could reasonably have disbelieved his account due to the credibility issues discussed previously. Namely, pictures admitted by the State showed no injuries to defendant; defendant did not seek medical attention at the police station despite his account involving a significant attack by Pendergrass; and defendant did not inform the police that Pendergrass strangled him, that he could not breathe, that he was afraid, or that he believed Pendergrass was going to kill him. Further, although defendant claimed that Pendergrass hit, kneed, and shoved him after hitting his phone, we note that there is seemingly no pause on the video between Pendergrass slapping defendant's phone and defendant pulling out his knife, let alone a pause long enough for Pendergrass to deliver three different attacks, as defendant claimed. All of these inconsistencies may reasonably have undermined his assertions that his life was threatened, such that he felt deadly force was necessary.

¶ 76 Further, although defendant argues that the evidence showed that he was the only person to have defensive wounds and Pendergrass had none, the jury could have reached a different conclusion. The jury sent a note to the trial court during deliberations stating, "People's Exhibit 181 shows Joe's hand, his middle finger shows a cut." This suggests that the jury might have believed that, contrary to the defense's assertion, Pendergrass did bear a wound consistent with

defending himself from an attack. See *People v. Grayson*, 321 Ill. App. 3d 397, 402 (2001) (finding that, where the victim had numerous injuries and the defendant had none, "[t]he apparent one-sided nature of the struggle supported the State's theory that [the] defendant did not act in self-defense.").

¶ 77        Finally, we note that there was no evidence that Pendergrass brandished a weapon in the encounter. Defendant argues on appeal that this is not determinative, as Pendergrass was larger than him and therefore could have delivered significant harm without the use of a weapon. He also argued at trial that, off-camera, Pendergrass attempted to steal his knife. However, there was no definitive evidence in support of the claim that Pendergrass attempted to steal his knife or that Pendergrass used physical force. Indeed, we note that despite Pendergrass's alleged physical advantages, and despite the fact that defendant claims Pendergrass had him pinned on the ground, the encounter between the two men somehow ended with Pendergrass sustaining four stab wounds, while defendant only sustained a cut to his finger that could easily have been the result of an accidental slip of his own hand. Defendant does not explain how the same physical dominance that made him fear for his life did not also enable Pendergrass to inflict a single substantial injury to defendant.

¶ 78        It is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *Lee*, 213 Ill. 2d at 225. Given the lack of evidence regarding if or what physical contact Pendergrass ever made with defendant's person, and given defendant's questionable credibility, we conclude that a reasonable jury could have found that defendant used deadly force on Pendergrass when it was not necessary.

¶ 79                              B. Admissibility of the 911 Call

¶ 80		Defendant next argues the trial court erred in barring the admission of the 911 call he made on the day of the stabbing. He asserts, as he did in the court below, that the call was an excited utterance and, therefore, an exception to the general bar on hearsay. Additionally, defendant raises, for the first time on appeal, the argument that he should have been allowed to testify regarding the 911 call because he raised the affirmative defense of self-defense and the 911 call was probative of his state of mind for that purpose.

¶ 81		Hearsay evidence refers to an out-of-court statement offered to prove the truth of the matter asserted. *People v. Burney*, 2011 IL App (4th) 100343, ¶ 38. It is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule. *Id.* For a hearsay statement to qualify as an excited utterance, and thus a hearsay exception, "there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, there must be an absence of time for the declarant to fabricate the statement, and the statement must relate to the circumstances of the occurrence." *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). When determining whether a statement is admissible as an excited utterance, courts consider the totality of the circumstances and analyze factors such as time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest. *Id.* With respect to the issue of time, the critical inquiry is whether the statement was made while the excitement of the event predominated. *Id.* We review the trial court's rulings on hearsay testimony and any applicable exceptions for an abuse of discretion. *Burney*, 2011 IL App (4th) 100343, ¶ 40. An abuse of discretion exists where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 82		Defendant argues that numerous factors rendered the 911 call an excited utterance. He notes that only six to seven minutes elapsed between the time of the altercation with

Pendergrass and the time of the call, showing he lacked time to fabricate a story, and that the testimony from both his wife and the 911 dispatcher that he was excited and speaking quickly suggested he was still experiencing the excitement of the event at the time he made the call.

¶ 83       We find the trial court's decision to bar the 911 call was not an abuse of discretion. The court's decision was based on its assessment of the totality of the circumstances of the call. Specifically, the court found that the time that had elapsed between the stabbing and the call was sufficient to allow defendant to reflect on the incident and begin to construct a narrative to his benefit. It noted that defendant's statements on the call were self-serving, he was aware of preserving evidence, he was coherent and organized in his thinking, he was focused more on establishing his version of events than seeking assistance from police, and his voice was different when talking to his wife versus talking to the dispatcher. It found all of these factors suggested that defendant's statements were not spontaneous utterances made while the excitement of the event predominated but were instead calculated efforts to establish a beneficial narrative. Defendant essentially asks us to reweigh these factors and determine that, because certain factors may also be construed in his favor, the trial court's ruling was an abuse of discretion. We will not do so.

¶ 84       Defendant further argues that because he raised the affirmative defense of self-defense, he should have been allowed to testify to out-of-court statements that were probative of his state of mind. He relies on *People v. Quick*, 236 Ill. App. 3d 446, 451-53 (1992), and asserts that testimony regarding the call is not hearsay because it is relevant to the issue of his state of mind and not the truth of the matter asserted.

¶ 85       We note that, in the trial court, defendant only sought to admit the 911 call as an excited utterance exception to the bar on hearsay. He never argued that the call should be admissible, not for the truth of the matter asserted, but as probative of his state of mind. "We will

not impute error to a trial court for failure to consider a theory not fairly presented. The trial court does not have a duty to consider all possible theories; rather, its task is to rule on the basis of the theories presented." *People v. Hamilton*, 283 Ill. App. 3d 854, 861 (1996), *rev'd on other grounds*, 179 Ill. 2d 319 (1997). "In the context of evidentiary rulings it is firmly established objections on specific grounds waive all other grounds." *Id.* Where defendant here did not allow the trial court to consider this theory of admission of the 911 call, we find he has waived on appeal the argument that the court erred in admitting the call on the basis of that theory. See *Salcik v. Tassone*, 236 Ill. App. 3d 548, 555 (1992) (finding that where the plaintiff only argued that a statement should be admitted as a past recollection recorded and not for impeachment of a prior inconsistent statement, she had waived the latter theory on appeal).

¶ 86 Additionally, we agree with the State that *Quick* and the proposition therein is inapplicable to the circumstances before us. In *Quick*, the defendant was convicted of soliciting an undercover police officer to kill her husband. *Quick*, 236 Ill. App. 3d at 447. On appeal, she argued that the trial court erred in prohibiting her from testifying to out-of-court statements made by an acquaintance of defendant, who she claimed had entrapped her into committing the offense and told her he would kill her if she backed out. *Id.* at 451.

¶ 87 The appellate court found that the trial court had improperly excluded these statements as hearsay and that they were not offered for the truth of the matter asserted, but for their effect on the defendant's state of mind. *Id.* at 453. The court observed that "[a]n out-of-court statement used for purposes other than establishing the truth of the matter asserted may be admissible to show the state of mind of the recipient after hearing the statement." *Id.* If the statement was offered to prove its effect on the listener's state of mind, or to show why the listener acted as she did, it was not hearsay. *Id.* In short, the conversations were admissible to show that

the defendant believed she was being threatened and entrapped, although not to show that the defendant actually was being threatened and entrapped.

¶ 88 It is therefore unclear how defendant seeks to apply *Quick* to the instant case. Defendant argues that the 911 call should also have been admissible to prove his state of mind, but this argument does not make sense. The 911 call was a conversation between defendant and the 911 dispatcher, Nowling. To apply *Quick* to the instant case would be to argue that defendant's statements to Nowling should have been admissible to show Nowling's state of mind or, alternatively, that Nowling's statements to defendant should have been admissible to show his state of mind. However, Nowling's state of mind is irrelevant to the question of whether defendant acted in self-defense, and Nowling's statements to defendant could not have affected his state of mind in the incident with Pendergrass when that incident took place before defendant spoke to Nowling and Nowling did no more than question defendant as to what happened. We note that at no point in the 911 audio does defendant relay any statements that Pendergrass may have made to him. To the contrary, he specifically can be heard stating that Pendergrass "never said a word hardly" before attacking him. Therefore, even setting aside the issue of waiver, we are not persuaded by defendant's argument that *Quick* is applicable.

¶ 89 C. The State's Closing Argument

¶ 90 Next, defendant argues that he was denied his right to a fair trial when the State, in its closing argument, (1) commented on excluded evidence, specifically, the audio of the 911 call, (2) misstated the law, and (3) shifted the burden of proof to him. He acknowledges that he failed to preserve these issues by not objecting to them at trial or raising them in a posttrial motion. Nevertheless, he urges us to review them as plain error.

¶ 91         To preserve an error for consideration by a reviewing court, a defendant must both object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture". *Id.* However, forfeiture may be overcome where a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *Id.* Where a defendant fails to establish plain error, the procedural default will be honored. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 55. The first step in a plain-error analysis is to determine whether or not an error occurred. *Id.* ¶ 53.

¶ 92                          1. *Comments on Excluded Evidence*

¶ 93         Defendant argues that the State improperly commented on excluded evidence when it said, of his statements to police officers and his wife following his arrest, "Wouldn't you, in the heat of the moment, say, ['H]e was trying to kill me?['] That's the first thing you say. *** Never says anything about that." Defendant argues that this comment from the State "distorted the truth" because, in his excluded 911 recording, he is heard telling both Mary Ann and the 911 dispatcher that Pendergrass attacked him, refuting the State's claim that he "[n]ever sa[id] anything" to that effect. He argues that the State's "misstatement" was prejudicial and warrants reversal.

¶ 94         The State is generally given wide latitude in making its closing argument. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). The State may comment on the evidence and any fair and reasonable inferences to be drawn from it. *Marzonie*, 2018 IL App (4th) 160107, ¶ 47. However, it is improper to comment on evidence that has been excluded. See *id.*; *People v. Mullen*, 141 Ill. 2d 394, 404 (1990). When reviewing the propriety of the State's remarks in closing argument, the remarks must be viewed in the context of the argument as a whole. *Marzonie*, 2018 IL App (4th)

160107, ¶ 47. Whether statements made by a prosecutor during closing argument were so egregious that they warrant a new trial is a legal issue we review *de novo*. *Id.* ¶ 50. A prosecutorial comment is not reversible unless it is both improper and substantially prejudicial to the point where it is impossible to say whether a guilty verdict resulted from the comment. *Wheeler*, 226 Ill. 2d at 123.

¶ 95        We find no error in the State's comment. Contrary to defendant's argument, the State's comment was not in reference to the excluded 911 call, but in clear reference to the statements defendant admitted making to his wife and police officers at the police station after the attack on Pendergrass. Defendant testified at trial that he did not tell officers that Pendergrass choked him, that he could not breathe, that he was afraid, or that he believed Pendergrass was going to kill him, all claims he later made at trial. The State was entitled to comment on the discrepancy and its relation to defendant's credibility. Similarly, defendant also confirmed that, when speaking with his wife from the police station after the incident, he stated that he could not remember the details of what happened. He further confirmed the truth of this statement. Despite this, defendant was able to give a precise play-by-play of the event some eight years later at his trial. We conclude that the State's comment that defendant "[n]ever sa[id] anything about" the specifics of Pendergrass's attack was a proper comment on evidence that showed precisely that.

¶ 96        Defendant likens this case to *People v. Wilson*, 120 Ill. App. 3d 950 (1983). There, the defendant, who was convicted of rape and deviate sexual assault, argued that the prosecutor made improper comments in closing argument by commenting on the fact that the defendant's primary psychiatrist had not testified as to defendant's sanity at the time of the offense. *Id.* at 961. However, defense counsel's subpoena of defendant's primary psychiatrist had previously been quashed at the urging of the prosecution. *Id.* The appellate court determined that the prosecution's

comment was, therefore, "improper and unprofessional." *Id.* In addition to this comment, the court also held that other comments by the State were improper and that the defendant was denied his right to a fair trial when the trial court denied his requests for continuances and quashed subpoenas for critical defense witnesses. *Id.* at 960-62. Based on the combined effect of these errors, it reversed defendant's conviction and remanded for a new trial. *Id.* at 962.

¶ 97　　　　　Defendant argues that the instant case is similar to *Wilson* because, here, the State sought to exclude defendant's 911 call, in which he told the dispatcher that Pendergrass attacked him and attempted to kill him, and then later argued at trial that defendant never made statements to that effect.

¶ 98　　　　　To begin, we note that the court in *Wilson* based its decision on multiple errors, and although it characterized the prosecutor's comment on evidence the State itself had moved to exclude as "improper and unprofessional" (*id.* at 961), it is unclear if this alone would have been sufficient grounds to reverse. Regardless, based on our earlier discussion regarding the prosecutor's statement in the instant case, we find *Wilson* clearly distinguishable. In *Wilson*, the State specifically commented on the defense's lack of certain evidence after moving to have that same evidence excluded. In contrast, in the instant case, the State commented on properly admitted evidence, *i.e.*, defendant's testimony regarding statements he made to police officers and his wife on the day of the stabbing. As discussed earlier, we do not find that the State's comments referenced the excluded evidence of the 911 call but were instead comments on the fact that, in speaking with police, defendant omitted certain significant information that he later offered at trial. *Wilson*, therefore, is of no help to defendant in the instant case. We find no error in the State's comment.

¶ 99　　　　　　　　　　　　　　2. *Misstatement of the Law*

¶ 100    Defendant also argues that the prosecutor misstated the law regarding its cross-examination of defendant on the statements he made to police officers. Defendant argues that his " 'failure' to tell police at the police station that he was afraid Pendergrass was going to kill him does not mean that the jury could consider, as substantive evidence, that [defendant] was *not* afraid that Pendergrass was going to kill him." (Emphasis in original.) Although defendant does not provide us with the specific statements from the State that he takes issue with, based on his assertion, we assume that the following comment from the State is representative:

> "[Defendant] [a]dmits he never told the police he was being choked. Admits he never told the police he was scared for his life. Admits he never told the police that he was scared as hell or thought [Pendergrass] was going to kill him. *All that stuff can be considered substantively*. Even though he didn't say it and I read it and he admitted to it, *that's all substantive evidence*." (Emphases added.)

¶ 101    Section 115-10.1 of the Code of Criminal Procedure of 1963 provides that prior inconsistent statements are not "made inadmissible by the hearsay rule" if certain conditions are met. 725 ILCS 5/115-10.1 (West 2024). One of those conditions is that the prior statement is inconsistent with the testimony of the declarant at trial. *Id.* § 115-10.1(a). Defendant, relying on *People v. Lawrence*, 268 Ill. App. 3d 327, 333 (1994), argues that his omission of certain factual details from his statement to police officers did not render the statement inconsistent with his later trial testimony, where he did offer those details. See *id.* ("When certain evidence is omitted from an earlier statement, but later found to be relevant and testified to at trial, this does not constitute an inconsistency for the purposes of [section 115-10.1].") As such, he argues the State misstated the law in informing the jury it could consider those statements substantively.

¶ 102　　　　Defendant is incorrect. While it is true that certain omissions in prior statements may not constitute an inconsistency, it is also true that a witness's "omission of 'a significant matter that would reasonably be expected to be mentioned if true' " constitutes an inconsistency. *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 50 (quoting *People v. Zurita*, 295 Ill. App. 3d 1072, 1077 (1998)). Here, statements to the effect that defendant was in fear for his life and believed Pendergrass intended to kill him are so significant and central to the event that it could be expected that he would have mentioned them to police officers if they were true. Accordingly, we find that the State did not misstate the law when it informed the jury that it could consider defendant's statements to police substantively. We therefore find no error.

¶ 103　　　　As a final note, we acknowledge that defendant's assertion is partly accurate. It is true that his failure to tell police that he was afraid for his life did not mean that he, in fact, was not afraid for his life. However, the State did not compel the jury to draw this conclusion in its closing argument. It merely informed the jury that it could consider defendant's prior statement, and its omissions, substantively. Because the inconsistency in defendant's prior statement stemmed from an omission, the "substance" of the statement is merely that it was not made. The jury was free to conclude from that what it wished, including that defendant did not relay his fear for his life to police because it did not exist. Similarly, the jury was free to conclude, as defendant explained at trial, that he neglected to mention this fact to police only because he was providing them a bare-bones retelling of the events of the day. Regardless, the State, in informing the jury that it could consider the omission in defendant's statements to police substantively, did not misstate the law.

¶ 104　　　　　　　　　　　　　3. *Burden of Proof*

¶ 105    Defendant further argues that the State improperly shifted the burden of proof to him in its closing argument when it commented, "And let me say something right here. Defendant has no burden. *In this case they do for self defense*, but defense has no burden." (Emphasis added.)

¶ 106    The State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *Lee*, 213 Ill. 2d at 224. However, in order to raise the affirmative defense of self-defense at trial, the defendant must present some evidence on the issue unless the State's evidence raises the issue. *People v. Sanchez*, 2025 IL App (1st) 242015-U, ¶ 34. " 'Although the threshold of evidence required to raise an affirmative defense is low, the defendant bears the burden to satisfy that requirement.' " *Id.* (quoting *People v. Kite*, 153 Ill. 2d 40, 45 (1992)).

¶ 107    We do not believe the State's comment here shifted the burden of proof to defendant. Rather, we find the State was merely commenting, somewhat imprecisely, on the fact that a defendant initially bears the burden of raising an affirmative defense, such as self-defense. See *id.* ¶ 39 (finding the State's comment that self-defense was the defense's burden was not improper and was "not entirely inaccurate" due to the defendant's burden of production for affirmative defenses).

¶ 108    Moreover, we note that immediately prior to the State's comment that the defense bore the burden for self-defense, it stated, "Defendant has no burden." Similarly, immediately after the contested statement, the State again reiterated, "[D]efense has no burden." Considering that (1) the State's comment was correct inasmuch as it referenced defendant's burden of production on affirmative defenses, (2) the State's comment was sandwiched between acknowledgements that defendant bore no burden, and (3) the trial court admonished the jury separately that the State bore the burden of proving defendant guilty beyond a reasonable doubt and defendant was not required to prove his innocence, we find that, even if the statement was improper, when the surrounding

circumstances are taken into account, it was not so prejudicial as to constitute reversible error. See *People v. Williams*, 2022 IL 126918, ¶ 45 (finding an improper comment made by the prosecution in closing argument was not substantially prejudicial where the comment was brief and the jury was reminded that the State bore the burden of proof).

¶ 109　　　　Because we find no clear or obvious error in the State's closing argument, defendant has failed to establish plain error. Accordingly, we will honor his forfeiture on the issue of an improper closing argument.

¶ 110　　　　　　　　　　　　D. IPI Criminal No. 24-25.09

¶ 111　　　　Defendant's final argument is that the trial court erred in giving IPI Criminal No. 25.09, the initial-aggressor instruction, where there was no evidence that defendant was the initial aggressor.

¶ 112　　　　"The State and the defendant are both entitled to have the jury instructed on their theories of the case, and an instruction is warranted if there is even slight evidence to support it." *People v. Heaton*, 256 Ill. App. 3d 251, 257 (1994). It is error to give IPI Criminal No. 24-25.09 where there is no evidence that a defendant was the initial aggressor. *People v. Chavez*, 265 Ill. App. 3d 451, 458 (1994). However, the instruction may be given where there is a question as to whether the defendant was the initial aggressor. *Heaton*, 256 Ill. App. 3d at 257. Giving this instruction does not assume that the defendant was the initial aggressor but allows the jury to decide between conflicting evidence and apply the correct law. *Id.* The decision to give a jury instruction is within the sound discretion of the trial court, and we will not reverse absent an abuse of discretion. *People v. Hale*, 2012 IL App (4th) 100949, ¶ 19.

¶ 113　　　　Defendant argues that IPI Criminal No. 24-25.09 was improperly given where both parties and the trial court agreed that he was not the initial aggressor. He asserts that the State

sought to have IPI Criminal No. 24-25.09 read not because it was arguing that defendant was the initial aggressor, but because it was arguing that Pendergrass had the right to defend himself after he withdrew. Defendant asserts that IPI Criminal No. 24-25.09 addresses the conduct of the defendant and not the victim, whose use of force is not at issue. He argues, "[B]ecause Pendergrass was not the one on trial, the jury was not faced with determining whether or not Pendergrass had a duty to withdraw."

¶ 114        To begin, as stated above, we disagree with defendant's assertion that the State conceded that defendant was not the aggressor. However, more importantly, we find that the evidence presented at trial justified giving IPI Criminal No. 24-25.09. We find *Heaton* instructive on this point. There, the defendant argued on appeal that the trial court had erred in giving IPI Criminal No. 24-25.09 where there was no evidence that he was the initial aggressor. *Heaton*, 256 Ill. App. 3d at 257. The appellate court disagreed. It held that the initial confrontation between the defendant and the victim had ended at an earlier point in the evening. *Id.* at 258. However, a second confrontation had begun when the defendant chased the victim, who was retreating to his car, with a baseball bat. *Id.* The court determined that these facts created a question for the jury of whether the defendant became the "initial aggressor in the fatal confrontation." *Id.* It therefore concluded the trial court did not err in giving the initial-aggressor instruction. *Id.*; see *People v. Brown*, 406 Ill. App. 3d 1068, 1080 (2011) (finding the initial-aggressor jury instruction was appropriately given where the evidence showed that the defendant became the aggressor when he pursued one of the victims, who was retreating).

¶ 115        Here, the State argued that defendant became the aggressor in the altercation after Pendergrass had moved away from him when he brandished the knife. Contrary to defendant's argument, there was sufficient evidence to suggest that he became the aggressor after Pendergrass

stepped back and defendant moved toward him. The initial-aggressor instruction was not relevant to whether Pendergrass had a duty to withdraw but whether defendant did. We hold the trial court did not err in giving this instruction.

¶ 116                                    III. CONCLUSION

¶ 117          For the reasons stated, we affirm the trial court's judgment.

¶ 118          Affirmed.